**FIRST COMPLIANCE REPORT**
**LAKE COUNTY JAIL**
**June 2011**

**A.  MEDICAL CARE:  Settlement Agreement Section III Part A.**

*1.*      *LCJ shall provide adequate services to address the serious medical and mental health needs of all inmates.*

**OVERALL COMPLIANCE RATING:     NON COMPLIANCE**

**ASSESSMENT:**

Adequate services are not being provided.  The facility is beginning to revamp their medical program.  On the day of our visit, the new Medical Director had yet to begin examining patients, put into place leadership changes, establish a table of organization (staff did not know who was in charge), develop policies and procedures, make available adequate space, or initiate key processes.

The Sheriff is recently elected and is committed to leading this program back to respectability.  However, he has many key decisions to make.  The Sheriff needs to decide whether to contract out services or manage them internally.  MedStaff has been the contract medical vendor since 2007, supplying all medical staff.  Dean Lichtenfeld, an RN, is the CEO of the organization and has been in that capacity for several months.  The Director of Nursing for MedStaff was recently terminated and Susan Lass is the acting DON.  No one in the organization has experience in correctional medical care.  No leader in the organization has been in place for over a year.  The organization lacks leadership and direction.  Line staff do not know who is in charge and the program is drifting managed by line staff who have created their own processes.  A Department of Justice Compliance Work Group has been established but this group has had only one meeting.  This group consists of 7 different working groups.  There is an Oversight Group and two other groups that work specifically on medical care; a Medical/Dental Work Group and a Quality Assurance and Quality Management Oversight Team.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1.  The Sheriff must solidify his leadership team and develop a table of organization which provides clear direction to line staff.
2.  The Sheriff must organize his medical program so that all participants know who is in charge; know who is responsible for what; and know what the overall plan of action is. Someone must be in charge.
3.  It should be made clear how the consultants are integrated into the organization.
4.  The organization should consider supplementing his team with a leader with experience in correctional medicine sufficient to assist the program toward compliance with this agreement.

**2.    *LCJ shall develop and implement medical care policies, procedures, and practices to address and guide all medical care and services at LCJ, including, but not limited to the following:***

> (1)    *access to medical care;*
> (2)    *continuity of medication;*
> (3)    *infection control;*
> (4)    *medication administration;*
> (5)    *intoxication and detoxification;*
> (6)    *documentation and record-keeping;*
> (7)    *disease prevention;*
> (8)    *medical triage and physician review;*
> (9)    *intake screening;*
> (10)   *infection control;*
> (11)   *comprehensive health assessments;*
> (12)   *mental health;*
> (13)   *women's health;*
> (14)   *quality management; and*
> (15)   *emergent response.*

**OVERALL COMPLIANCE RATING:  NON COMPLIANCE**

**ASSESSMENT:**

The existing state of policies is chaotic.  MedStaff, the medical vendor, provided me with their policy manual which is dated January of 2009.  This manual is not signed as reviewed by anyone.  The manual is a boiler plate manual developed by mimicking the National Commission on Correctional Health Care standards.  However, the manual does not reflect actual practice at the facility.  For example, the manual states that there are quarterly administrative meetings when no such meetings take place.  The manual stipulates 7 separate signatures of reviewer but none of these reviews were present in the manual provided to me.  The manual calls for a Quality Improvement committee and monitoring which do not exist.  The manual does not provide sufficient guidance on key items of this agreement as listed above.

One of the consultants provided a policy and procedure development guideline to be used by the Medical and Mental Health Programs in developing policies and procedures.  According to the consultant, this document was not utilized by the medical and mental health vendors in development of policy or procedure.  This document is a "how to" manual on policy development.  Assuming that leadership can adequately implement this manual, it would be a useful guide in developing a policy for a given area.

In interviews with multiple line staff, none were aware of any existing policy or procedure pertinent to their area of service.  Staff work by historical practice patterns and train each other in a variety of ways which do not appear to be standardized.  A standardized procedural manual does not exist.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Develop key policies relevant to this agreement and listed above in item 2 of this Part A of the Settlement Agreement.
2. Consider soliciting additional expertise in correctional medical areas sufficient to guide policy development.

*3.*   *Intake Screening and Health Assessments.*

   *a.*   *LCJ shall develop and implement policies and procedures to ensure that adequate medical and mental health intake screenings and health assessments are provided to all inmates within 14 days.  See also Section B. 2a-c of the Settlement Agreement (SA).*

   *b.*   *LCJ shall ensure that, upon admission to LCJ, Qualified Medical Staff utilize an appropriate medical intake screening instrument to identify and record observable and non-observable medical needs, and seek the inmate's cooperation to provide information, regarding:*

   *(1)*   *medical, surgical, and mental health history, including current or recent medications;*
   *(2)*   *current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;*
   *(3)*   *history of substance abuse and treatment;*
   *(4)*   *pregnancy;*
   *(5)*   *history and symptoms of communicable disease;*
   *(6)*   *suicide risk history; and*
   *(7)*   *history of mental illness and treatment, including medication and hospitalization. Inmates who screen positively for any of these items shall be referred for timely medical evaluation, as appropriate.*

   *See also Section B. 2a-c of the Settlement Agreement (SA).*

   *c.*   *LCJ shall ensure that the comprehensive assessment performed for each inmate within 14 days of his or her arrival at LCJ shall include a complete medical history, physical examination, mental health history, and current mental status examination. The physical examination shall be conducted by Qualified Medical Staff. Records documenting the assessment and results shall become part of each inmate's medical record. A re-admitted inmate or an inmate transferred from another facility who has received a documented full health assessment within the previous three months and whose receiving screening shows no change in the inmate's health status need not receive a new full physical health assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.  See also Section B.3a of the SA*

d.  *LCJ shall ensure that Qualified Medical Staff attempt to elicit the amount, frequency and time of the last dosage of medication from every inmate reporting that he or she is currently or recently on medication, including psychotropic medication.*

e.  *LCJ shall implement a medication continuity system so that incoming inmates' medication for serious medical needs can be obtained in a timely manner, as medically appropriate when medically necessary. Within 24 hours of an inmate's arrival at LCJ, or sooner if medically necessary, Qualified Medical Staff shall decide whether to continue the same or comparable medication for serious medical needs. If the inmate's reported medication is discontinued or changed, a Qualified Medical Professional shall evaluate the inmate face-to-face as soon as medically appropriate and document the reason for the change.*

f.  *LCJ shall ensure that incoming inmates who present with current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional. Staff will constantly observe such inmates until they are seen by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population. See also Section C (Suicide Prevention) of the SA.*

g.  *LCJ shall ensure that all inmates at risk for, or demonstrating signs and symptoms of drug and alcohol withdrawal are timely identified. LCJ shall provide appropriate treatment, housing, and medical supervision for inmates suffering from drug and alcohol withdrawal.*

h.  *LCJ shall incorporate the intake health screening information into the inmate's medical record in a timely manner.*

i.  *LCJ shall ensure that correctional officers supervising newly arrived inmates physically observe the conduct and appearance of these inmates to determine whether they have a more immediate need for medical or mental health attention prior to or following the intake health screening by Qualified Medical Staff.  See also Section C.4 (Suicide Prevention Training).*

**OVERALL COMPLIANCE RATING:   NON COMPLIANCE**

**ASSESSMENT:**

Emergency Medical Technicians ("EMTs") working in intake are not guided by a standardized policy or procedure.  There is an intake policy in the MedStaff policy manual of 2009 but it is inadequate.

EMTs perform screening. On several charts reviewed, EMTs missed major items of concern or failed to identify an issue as something that needed to be brought to the attention of medical staff. These screening evaluations are done in public areas without privacy which detracts from the accuracy of the evaluations. There is no symptom history of TB and no HIV history. The EMT staff refer to nurses anyone that they identify with a medical problem which results in a redundant evaluation. It would be better if Registered Nurses performed these screening evaluations in the first instance. There is no training of the EMT staff in how to screen and refer. When the EMT identifies a problem, they send a "TO DO" note electronically to nursing and the nurse will follow up. One midlevel provider reviews EMT evaluations but this is not specified in policy or procedure and is not consistently performed.

The purpose of the 14 day assessment is to evaluate the health status of persons coming into the jail. For persons with chronic illness or other medical conditions, the health status is an important first step in ensuring that the detainee has his or her medical condition correctly identified and correctly managed. This does not occur at Lake County Jail. The 14 day assessment is treated as a formality which must occur for all inmates by day 14 regardless of the medical condition of the detainee. Those with medical conditions should be seen earlier than 14 days depending on the severity and acuity of their condition. This is not occurring. Because providers are focusing on getting 14 day assessments done by day 14 they neglect attending to persons with serious medical conditions.

A health assessment report done by a medical assistant, showed all inmates who were incarcerated longer than 14 days but did not have a 14 day assessment. There were 27 overdue individuals. Patients are scheduled on day 8 of incarceration for their assessment. On the day of my visit, 263 inmates were in need of a 14 day assessment. Twenty people are scheduled daily (Monday through Friday) for the 14 day assessment but only about 8 are seen. Thus, most individuals coming into the jail fail to get a 14 day assessment. This includes individuals with serious chronic illness who may never see a physician for a status update of their illness. The system, therefore, fails to accomplish the major goal of this initial screening process – to capture and assess those with serious and/or chronic illnesses. At the assessment rate described above, the steady state of this system is that most individuals leave the jail before the 14 day assessment is finished.

EMTs ask questions about medication. The question regarding psychotropic medications is on the Admitting Medical Assessment Forms. If a person is on medication, the medic notifies a nurse who comes to see the patient. The nurse verifies with the community pharmacy that the patient is on medication and orders the medication in CorrectTek. Nurses are writing orders for medication. I was told that these orders are verbal orders but there is nothing in the medical record to verify that these are verbal orders. Physicians do not sign off on any of these orders. This has the appearance of nurses ordering medication. Daily, a list of medications is sent to In Touch, the pharmacy. They will send medication within 24 hours or the following day. A few dozen drugs are kept in the emergency drug storage. If inmates bring their own medication they are allowed to use it. This can be problematic if the nurse does not verify every pill. It would be better to not permit this practice. Nurses manage medication ordering until a physician sees the

patient which may not occur for days or weeks. There is no evidence that physicians are involved in medication management during the first weeks of incarceration.

For detainees with drug or alcohol withdrawal issues, care is fragmented. When EMTs identify patients with drug or alcohol problems they write a "TO DO" referral to a nurse. One such referral I reviewed was not acted on by anyone. This can be a major patient safety issue. The EMT took a history that the detainee had delirium tremens (DTs) in the past. The detainee was not seen by anyone. Within a few days the detainee began acting bizarre on the unit and was seen by a mental health staff who had the detainee placed on the mental health unit. Within a day the inmate was hallucinating. The detainee was not referred for a medical examination by mental health staff. Within another day, the detainee developed seizures and lacerated his forehead. He was released from custody and sent to a local area hospital.

The existing acute alcohol withdrawal procedure which is established in the electronic record as an order, permits nurses to order scheduled drugs for treatment. This procedure should be reviewed and revised. The electronic version in the order section of the electronic record should be modified.

The screening information performed by EMTs is incorporated in the medical record. However on some charts reviewed the screening information was incompletely filled out. There is a process for PA or nurse review of the EMT work but this is not consistently performed.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Registered Nurses should perform intake screening.
2. The system should perform an acuity ranking system so that those with serious medical problems are timely seen after intake screening. Providers should prioritize those detainees with serious medical conditions.
3. A standardized system of review of the intake evaluations should be put in place.
4. Privacy should be established for intake screening evaluations.
5. Standardized alcohol and opiate withdrawal procedures should be developed and synchronized with orders in the electronic record. These procedures should be approved by the Medical Director and should be consistent with standardized treatment of withdrawal syndromes.
6. Perform an audit regarding the medication verification process that will include the bridging order and referral processes.

*4.*   *Acute care.*

   *a.*   *LCJ shall provide adequate and timely acute care for inmates with serious and life-threatening conditions, and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.*

**OVERALL COMPLIANCE RATING:    NON COMPLIANCE**

**ASSESSMENT**:

I discussed operational procedures with Susan Lass, acting DON and Dean Lichtenfeld, the CEO of MedStaff.  I also reviewed several medical records.

Inmates requiring acute care hospitalization are sent to local area hospitals:  Pinnacle Hospital, South Lake Medical, or St. Anthony's.  Future plans call for an agreement with only South Lake Hospital.  Either an ambulance or squad car is used to transport the patient.  Due to the lack of physician coverage, almost all decisions to move patients to a hospital are made by a nurse in consultation with a physician.  Patients who require hospitalization are occasionally released from custody just prior to admission to a hospital.  This occurred with one patient during my visit.  I was told that this happens more than occasionally.  These patients should be tracked from a utilization and quality perspective.

Hospital arrangements appear adequate.   Transport of patients to a hospital appears adequate.  However, the management of seriously ill patients at the correctional facility is poor and this poor care results in excess and unnecessary hospitalization.  As well, when patients return from acute care hospitalization, they are not evaluated by a practitioner, which results in interruptions in the care plan.

One example was a patient who had a bullet fragment removed and had sutures placed to close the wound.  The inmate started putting in sick call requests because of an abscess on his buttock and to have the sutures removed.  The sutures had been in place for over two weeks; at least one week longer than necessary.  The detainee placed two sick call requests to address the abscess on his buttock but wasn't seen.  About ten days later a nurse saw the patient emergently and he was transferred to a hospital for treatment.  Upon return from the hospital, the patient wasn't ever seen by a physician even though a nurse ordered antibiotics upon return from the hospital.

 A second patient had hypertension, an old stroke, cardiac arrhythmia and high blood cholesterol.  An electrocardiogram was never done and though the physician saw the patient he wasn't examined.  He was seen on an emergent basis for cellulitis, a soft tissue infection, by a nurse and sent to the hospital.

Another patient was incarcerated with a history of asthma and sickle cell disease.  The patient had severe sickle cell disease.  A doctor saw the patient about a week after incarceration and the doctor did not examine the patient but did order lab tests.  The lab tests were significantly abnormal and would have indicated that a transfusion was indicated but the test results weren't reviewed for about two weeks.  During the period when the lab test was not attended to, the inmate had difficulty breathing, which could have been related to his anemia.  A nurse called the doctor at night and the doctor recommended admission.  The inmate was admitted to a hospital but released from jail during the hospitalization.

The lack of provider evaluations of inmates with serious medical problems results in an unnecessary pattern of hospitalization for acute problems due to a lack of management of routine problems.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Provider time should be increased so that all patients with chronic illness are evaluated timely with a thorough evaluation as needed based on their condition.
2. All inmates returning from the hospital should be seen immediately upon return by a Registered Nurse. A physician appointment should occur at least within 72 hours of hospitalization. The physician should evaluate the status of the patient and ensure that the problem which resulted in hospitalization is stabilized.
3. The organization should track all off site hospitalization and emergency room visits to include:
    a. Patient name
    b. Housing unit
    c. Date of service
    d. Hospital patient was sent to
    e. Reason for transfer
    f. Diagnosis at the hospital
    g. Length of stay
4. The Medical Director should review this list monthly and evaluate whether there were preventable hospitalizations. This process should be used to identify problems with care management.

5. *__Chronic care.__*

    a. *LCJ shall develop and implement a written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring, and continuity of care.*

    b. *LCJ shall adopt and implement appropriate written clinical practice guidelines for chronic and communicable diseases, such as HIV, hypertension, diabetes, asthma, and elevated blood lipids, consistent with nationally accepted guidelines.*

    c. *LCJ shall maintain an updated log to track all inmates with chronic illnesses to ensure that these inmates receive necessary diagnosis, monitoring, and treatment.*

    d. *LCJ shall keep records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.*

    e. *LCJ shall ensure that inmates with chronic conditions are routinely seen by a physician to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.*

    f. *LCJ shall ensure that inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically*

*appropriate care.*

**OVERALL COMPLIANCE RATING:    NON COMPLIANCE**

**ASSESSMENT:**

There is an inadequate chronic illness policy and procedure.  The 2009 policy manual of MedStaff does not address chronic care processes at the facility.  A reasonable policy would include:

    a.  Directions for what needs to occur when a person is identified with chronic illness at intake.

    b.  An acuity ranking that determines the timeliness of evaluation by a physician after intake.

    c.  The interval visit schedule for various types of chronic illness.

    d.  Directions for maintaining the problem list and for maintaining a chronic illness roster.

    e.  Reference to clinical practice guidelines that are used as the reference for managing various common illnesses.

    f.  Directions for staging degree of control and status and directions for interval follow up based n the degree of control.

I was given sample copies of two clinical practice guidelines.  Both of these were taken from the Federal Bureau of Prisons which is an organization of almost 200,000 inmates.  The MRSA guideline alone is 48 pages.  Using these guidelines would be acceptable but the guidelines would have to be modified so that the processes pertinent to the LCJ are included in the guideline and the items in the Federal guidelines which don't apply to the jail are removed.  The guideline given to me addresses inpatient treatment of MRSA but the LCJ does not have an inpatient unit.  .

The medical program provided a roster of persons with chronic illness but it contained only 65 persons which is approximately 7% of the population.  This is not credible.  A second list was provided that included 162 names but this list contained conditions which were not chronic diseases such as constipation.  Therefore, I could not verify that a complete, credible and accurate list of chronic illness patients exists.  Staff agreed with me.  I was told that the medical record software could produce such a list but this is not yet functional.  The electronic record does have the capacity to document chronic illnesses in a problem list, but it is not consistently used.  There should be standardized procedures for utilizing this function. Chronic illness is not tracked so there is no system to schedule persons with chronic illness for medical clinics to manage their illness.   As a result, persons with chronic illness are randomly seen on an episodic basis which chart reviews demonstrate result in bad outcomes.  There should be an electronic scheduling function within the electronic record.

The record has the ability to maintain records of treatment for chronic illness based on a review of the EMR. Specific chronic care notes, however, are rarely seen.  Provider notes on persons with chronic illness do not always address chronic care issues. In one example, a patient on warfarin who had not had adequate management of his anticoagulation, presented to clinic for a

pain control issue.  Instead of intervening and managing the patient's anticoagulation issues, the doctor only focused on the complaint.  This type of episodic management reflects a lack of chronic disease management.

Patients are not scheduled for chronic illness clinic.  Even when patients with chronic illness come to clinic for reasons other than their chronic illness, the providers do not update the status of the chronic illness.  Medication management mostly occurs by nurses renewing expired medications; it does not appear that there is physician involvement.  Persons on medication for chronic illness do not appear to have physician involvement regarding their medication management.

In reviewing charts the following problems were noted.

One inmate with significant emphysema, hypertension, and diabetes was only evaluated by a nurse.  She was discharged about two weeks after incarceration without having seen a physician.

Another patient with asthma did not have a measure of her lung function (Peak Expiratory Flow rate).  She was seen once and then not seen again for her chronic illness.  She was seen two months after her first physician visit for an abscess but her chronic illness problems were not addressed.

Another patient was on a medication that is used for chronic illness but the EMT in intake did not identify a chronic illness.  The patient's medication (warfarin and prednisone) were noted and a nurse ordered the medication.  Two weeks after incarceration the patient was seen for a rash but the chronic illness was not evaluated.  A month later the patient was again seen for a rash and again the chronic illness was not address and the patient was left on the medication which has significant complications when not managed properly.  Five weeks after incarceration a midlevel provider identified one of the chronic illnesses (a deep vein thrombosis).  This accounted for the use of warfarin.  Warfarin is an anticoagulant used to treat clots.  The history of this person's clot was not thoroughly identified and it is not clear that the patient needed the treatment.  Because the degree of anticoagulation was not monitored adequately, the patient sustained a near life-threatening bleeding episode.  The treatment, except for the potentially life threatening episode, was consistently subtherapeutic.  Despite months in the jail the providers did not obtain therapeutic drug levels of the anticoagulant.  The providers did not identify whether the patient even needed the anticoagulant.  As well, the patient remained on a very high dose of steroids and the reason for using this medication was never identified.  This episodic type care was inadequate.

A person with HIV disease, asthma and epilepsy had medication ordered by a nurse.  He had come to the jail directly from a hospital but the reason for that hospitalization was not determined.  Several of his medical conditions were not identified at the jail but were noted in the hospital record which does not appear to have been reviewed.  The man complained of weight loss and difficulty swallowing but was not evaluated for AIDS related conditions.  His medications were renewed remotely by nurses without adequate physician involvement.  His HIV infection was never adequately evaluated during incarceration.

Lastly, there is no place to manage patients who need skilled nursing care. There is no infirmary unit. Patients with disabilities or who have serious chronic illness are housed on the 4th floor of the jail. This unit is treated no differently than a general population part of the jail. Nurses do not have expedited access; instead they must search out an officer to gain access to detainees even if the detainee has significant problems. The fourth floor has no cells which can accommodate someone with a disability in line with the American for Disabilities Act. Lastly, patients with serious medical conditions on this floor are not specifically tracked or rounded on in an organized fashion.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. Policy and procedure for chronic illness management must be developed.
2. Management of chronic illness should begin in intake with identification, acuity ranking and appropriate referral to a provider. Nurses must not perform medication management.
3. The providers must use a standardized method of recording problems in the electronic record which permits maintaining a roster of persons with chronic illness.
4. An electronic scheduling function should be available within the electronic record. In lieu of this a manual system must be used that ensures adequate scheduling which can be tracked.
5. Physicians must manage chronic illness by seeing patients at appropriate intervals, renewing medication, and performing thorough evaluations pertinent to the chronic disease being managed. Nurses should not renew medications.
6. Lab and other testing (EKGs) should be performed as indicated by appropriate guidelines at indicated intervals.
7. Chronic illness guidelines need to be developed or obtained from other national guidelines. However, these must be modified to mesh with the program at the Lake County Jail.
8. A system of management of patients with disabilities and serious medical problems equivalent to infirmary care must be established. Such a system would include:
    a. Admission by a physician
    b. Tracking of these 4th floor patients by name and diagnosis
    c. Acuity ranking of patients
    d. Defined interval evaluations by nursing and medical staff
    e. Rules for management of types of patients
    f. Rules for who can be admitted to the unit
    g. Discharge criteria
    h. Discharge only by a physician
    i. Complete access to physicians
    j. Adequate nursing coverage
    k. Physical space that accommodates ADA type patients
    l. A manual of care for nurses on the unit
9. Additional physician time needs to be added in order to see the volume of patients that exist. I would recommend a full time physician to start with and then to reassess whether all patients can be seen.

**6.** ***Treatment and Management of Communicable Disease.***

a.     *LCJ shall develop and implement adequate testing, monitoring, and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs").*

b.     *LCJ shall develop and implement infection control policies and procedures that address contact, blood borne and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs. Such policies should provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates.*

c.     *LCJ shall continue to test all inmates for TB upon booking at LCJ and follow up on test results as medically indicated, pursuant to Centers for Disease Control ("CDC") Guidelines. LCJ shall follow current CDC guidelines for management of inmates with TB infection, including providing prophylactic medication when medically appropriate. If directed by a physician, inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB, and hospitalized or housed in an appropriate, specialized respiratory isolation ("negative pressure") room on-site or off-site. LCJ shall provide for infection control and for the safe housing and transportation of such inmates.*

d.     *LCJ shall ensure that any negative pressure and ventilation systems function properly. Following CDC guidelines, LCJ shall test daily for rooms in-use and monthly for rooms not currently in-use. LCJ shall document results of such testing.*

e.     *LCJ shall develop and implement adequate guidelines to ensure that inmates receive appropriate wound care. Such guidelines will include precautions to limit the possible spread of Methicillin-resistant Staphylococcus aureus ("MRSA") and other communicable diseases.*

f.     *LCJ shall adequately maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.*

**OVERALL COMPLIANCE RATING:     NON COMPLIANCE**

**ASSESSMENT:**

A Registered Medical Assistant performs all tuberculosis skin testing. A nurse practitioner is in charge of infectious disease surveillance but he was unavailable for the entire tour. The Registered Medical Assistant does not follow any written guidelines. There is no evidence of any active surveillance for tuberculosis, MRSA, or influenza. Staff are not certain what needs to be done and what would constitute an active surveillance program. MRSA statistics are maintained by one of the clerical staff based only on positive cultures which are presented to him

by clinicians.  MRSA rates, not unexpectedly, are reported as very low because of the way infection is reported.

One of the consultants provided me a Federal Bureau of Prison clinical practice guideline for MRSA and blood borne pathogen exposure management.  Using other guidelines for the Lake County Jail will save time, but modifications must be made to adapt to conditions at the jail.  Despite the attempt of the consultant to assist the organization of a policy on infection control, there are no policies or procedures for infection control for the jail.  Lines of authority for infection control are not clear.  It is not clear what role the physician assistant has in managing this program and it appears from the structure of the program that there is insufficient knowledge on what should be done to manage such a program.

The Registered Medical Assistant ("RMA") has been doing TB screening for 15 years.  The RMA places Mantoux skin tests during the work week.  The process of screening is as follows.  The RMA uses the custody database (Spillman) to identify all intakes (Monday through Friday).  The RMA takes the list and finds the inmate and screens them Monday through Wednesday and again on Friday.  If a skin test is positive, the detainee is given a mask and put in a separate cell.  Proper isolation is not performed.  If negative pressure isolation is not present in the jail, and the individual is suspicious for active disease the patient should be hospitalized.  However, positive skin test inmates should be evaluated by a provider.  Those who do not have symptoms suggestive of active disease need a timely x-ray and may not need isolation.  For positive skin tests, an x-ray is ordered; mobile x-ray comes twice a week.  While the patient is waiting for the x-ray the nurse practitioner or other midlevel talks to the patient through the window of the cell the same day or next day.  The RMA thinks she has about 6-8 cases of positive PPD per month out of about 280 tested.  This is a 2% positivity rate which would be unusual for this area.

Potentially contagious inmates are placed in a single cell; there is no negative pressure isolation.  The patient is masked.  No other isolation is done.  This is not in keeping with national and Centers for Disease Control guidelines.

Guidelines for MRSA infection do not exist.  One of the consultants provided me a 48 page Bureau of Prison MRSA guideline.  It would be OK to use this with modification, but those modifications should be done.  In any case, the guideline he gave me is not used by staff.  The staff are working without any guideline to standardize care for MRSA.

A nurse practitioner maintains statistical data for infection control.  However, he is not trained in surveillance techniques.  There is no infection control nurse.  It does not appear that there is physician oversight over this program.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1.  Develop an infection control plan that includes tuberculosis screening, MRSA management and influenza management.  This plan should also include Occupational Health and Safety required blood borne pathogen practices and isolation procedures in the event of an airborne contagious disease event.
2.  Develop treatment guidelines for MRSA and tuberculosis.

3. Develop vaccination procedures for influenza.
4. Develop airborne isolation procedures consistent with Centers for Disease guidelines.
5. Assign a nurse to manage infection control issues.
6. Establish surveillance tracking of tuberculosis, skin test rates, conversion rates, employee conversion rates, and MRSA rates,
7. Establish physician oversight over infection control issues.

**7.** <u>**Access to Health Care.**</u>

    **a.** *LCJ shall ensure inmates have timely and adequate access to appropriate health care.*

    **b.** *LCJ shall ensure that the medical request ("sick call") process for inmates is adequate and provides inmates with adequate access to medical care. The sick call process shall include:*

        *(1) written medical and mental health care slips available in English, Spanish, and other languages, as needed;*

        *(2) a confidential collection method in which the request slips are collected by Qualified Medical Staff seven days per week;*

        *(3) opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and*

        *(4) opportunity for all inmates, irrespective of primary language, to access medical and mental health care.*

    **c.** *LCJ shall ensure that the sick call process includes logging, tracking, and timely responses by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g., referral; whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the inmate's next appointment. LCJ shall document the reason for and disposition of the medical or mental health care request in the inmate's medical record.*

    **d.** *LCJ shall develop and implement an effective system for screening medical requests within 24 hours of submission. LCJ shall ensure sick call requests are appropriately prioritized based upon the seriousness of the medical issue.*

    **e.** *LCJ shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.*

    **f.** *LCJ shall ensure that there is an adequate number of correctional officers to escort inmates to and from medical units to ensure that inmates requiring treatment have timely access to appropriate medical care.*

    **g.** *LCJ shall ensure that Qualified Medical Staff make daily rounds in the isolation*

> *areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.*
>
> **h.**  *LCJ shall revise its co-pay system in terms of amount and waivers and such policy will clearly articulate that medical care will be provided regardless of the inmate's ability to pay. No fee-for-service shall be required for certain conditions, including health screenings, emergency care, and/or the treatment and care of conditions affecting public health, e.g., Tuberculosis, MRSA, pregnancy, etc., particularly for indigent inmates who are not covered by a health insurance plan or policy.*

**OVERALL COMPLIANCE RATING:    NON COMPLIANCE**

**ASSESSMENT:**

Inmates in the Lake County Jail do not have timely or adequate access to health care.

A Registered Medical Assistant ("RMA") manages the sick call request scheduling process. The current version of the sick call slip is only in English. The form does not include mental health or dental items for inmates to check. Not all living units have a confidential collection box. On the units without a box, officers pick up the slips and hand them to nurses. The slips are picked up daily. Illiterate inmates get help from custody according to Ms. Smith. Inmates who speak other languages don't fill out health service requests. I am not sure what happens to them.

There is no current system to log or track sick call requests. The program was attempting to be able to enter information into CorrectTek, the electronic records system, but this has not been done. There is no current system to provide a list of the inmates who placed sick call requests on any day. There are no nursing progress notes or face to face encounters documented for any of the sick call requests reviewed.

Nurses collect the slips and review the slips daily. The nurse identifies to the RMA (as documented on the slip), the date the slip was received, whatever assessment was done and what needs to be done. The nurses select those inmates who need to be seen. The nurse will go to the cell and do a quick assessment which may include vital signs. Nurses do not do sick call assessments in the clinic; only cell side. This is inappropriate; all face to face encounters should be performed in a clinical setting. Because of staffing, the nurse assigned to perform sick call requests sees only as many as she is able to see in the day. I was told that typically there are about 50 requests a day and the nurse only sees about 10. Many of the rest are scheduled for the provider but the provider is only able to see a fraction of this number. Because of custody movement issues and security counts, clinic hours are limited to 8:30 AM to 10:30 AM and 12:30 PM to 2:30 PM. This is unacceptable. Even if more providers and nurses were hired, there are insufficient clinic hours to see everyone who needs to be seen. This system prioritizes requests on a random basis and only evaluates a fraction of the requests daily. Finally, not all

patients have access to be seen daily.  The schedule of providers is such that it is impossible to schedule on a daily basis referrals from nurses who may need to be seen.  This should be available at least five days a week.

The nurse who was performing sick call requests on the day of my visit estimated that about 15% of inmates get a cell side visit.  About 10% don't get seen because they leave or refuse.  All others are scheduled to be seen in clinic.  About 10 a day are scheduled to be seen in clinic.  But these appointments compete with appointments for 14 day assessments and chronic illness visits.  It is impossible to see the total volume of sick call requests, chronic illness visits and 14 day assessments in the allotted time provided by custody.  Thus, nurses only see patients cell side for sick call which is an inappropriate clinic setting in which to see patients.  The clinic itself is a large room with three side by side examination tables which are used simultaneously without privacy.  Officers sit in the room near the inmate.  There is no privacy.  The room is cluttered with papers, boxes of supplies, etc., and is not orderly.  This is an inappropriate setting to use as an examination room.  Also, nurses should not be evaluating inmates cell side.

I was provided a list of protocols which I assume are used by nurses when evaluating health requests.  These protocols assume that a diagnosis is made.  For example, one protocol is for strep throat.  This assumes that a nurse will make a diagnosis of streptococcal throat infection which the nurse is not licensed to do.  As well, these protocols give license to the nurse to prescribe medications (standing orders) which is not a good practice and may be illegal.

Given the hours of clinic, it is apparent that there are insufficient officers to escort inmates for the various scheduled clinic visits.  I was told that no shows to clinic are tracked but I was not provided information on this.  There will need to be an increase in the movement officer staffing to ensure that inmates are escorted to clinic.  Once in clinic there should be a written procedure for the conduct of officers in the clinic that ensures both safety and privacy.  The numbers of no shows should be tracked and provided to the Sheriff on a regular basis.

Every shift, the segregation rounds consists of walking around the segregation areas to pass medication and ask if everyone is OK.  This is not documented.  Custody maintains a book that tracks who comes on the unit but the purpose of medical visits does not indicate whether this is for rounds or medication administration.  There will need to be documentation of segregation rounds that indicates what occurred.

I was unable to evaluate the co-pay system.  One of the Med Staff employees does the billing for the co-pay program.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Sick call policy and procedure must be developed.
2. Secure collection boxes must be available on each living unit within the facility.
3. Sufficient staff should be available to evaluate all slips.
4. Nurses should triage all slips within 24 hours.
5. Emergent issues must be addressed immediately.

6. Slips that include symptoms must include a nurse face to face evaluation in a clinical setting. This should occur no later than 72 hours based on the clinical issue.
7. A system of tracking requests should be maintained. A list of items was provided to MedStaff personnel.
8. A way to document a face to face evaluation by nursing should be established in the medical record that associates with the medical card in question.
9. The "Inmate Medical Card" should be revised to include:
   a. Mental health requests
   b. Dental requests
   c. A space to date the day the card was received by medical and the date triaged by a nurse
   d. A space for a nurse to write a brief triaging note.
   e. Typical complaint types
10. Metrics should be instituted in the Quality Improvement program to include:
    a. The number of requests picked up daily
    b. The number of slips triaged within 24 hours
    c. The number of slips with symptoms that had a nurse evaluation within 72 hours.
    d. The number of slips referred for provider evaluation.
11. A monthly nurse quality evaluation should include supervisory review of a select number of nurse evaluations to ensure adequate quality.
12. All nurse evaluations should include vital signs.
13. Nurse protocols for evaluations should be developed. These must be approved by the Medical Director.

### 8. *Follow-Up Care.*

   a. *LCJ shall provide adequate care and maintain appropriate records for inmates who return to LCJ following hospitalization.*

   b. *LCJ shall ensure that inmates who receive specialty or hospital care are evaluated upon their return to LCJ and that, at a minimum, discharge instructions are obtained, appropriate Qualified Medical Staff reviews the information and documentation available from the visit, this review and the outside provider's documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.*

**OVERALL COMPLIANCE RATING:   NON COMPLIANCE**

**ASSESSMENT:**

When patients go out to a hospital or emergency room there is no standardized follow up evaluation except that they see a nurse. Nurses will order any new medication but there is no physician follow up at all. Physicians should order new medication and this should be documented in the electronic record. As well, physicians should see patients within 5 working days (sooner if clinically indicated) to evaluate the status of the patients who return from hospitals. A policy and procedure should be developed for this.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Upon return from the hospital or off-site consultation, all patients should go to a standard central location and be evaluated by a nurse and physician. If a physician is not present, the nurse should evaluate the patient and consult with a physician regarding any change in therapy. This discussion should be documented in the medical record.
2. The patient should be scheduled for a follow up physician visit to discuss and evaluate disease status.
3. A log of all off-site and hospital appointments should be maintained.
4. For quality purposes, the log should be evaluated monthly to assess whether follow up is occurring as indicated.

*9.*  *Emergency Care.*

   *a.*  *LCJ shall ensure that Qualified Medical and Mental Health Staff are trained to recognize and respond appropriately to medical and mental health emergencies. LCJ shall train correctional officers to recognize and respond appropriately to medical and mental health emergencies. LCJ shall ensure that all inmates with emergency medical or mental health needs receive timely and appropriate care, including prompt referrals and transports for outside care when medically necessary.*

   *b.*  *LCJ shall train all correctional officers to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in emergency situations. LCJ shall provide all correctional officers with the necessary protective gear, including masks and gloves, to provide first line emergency response.*

**OVERALL COMPLIANCE STATUS: NOT APPLICABLE (Unable to review the relevant data during this assessment. Will review during the next site visit).**

**ASSESSMENT:**

I was told by custody staff that CPR training of officers occurs but I was unable to document this.

Custody staff should all receive CPR training. In addition, the Medical Director should provide to officers a brief periodic training on recognition of serious medical conditions such as out of control diabetes, drug withdrawal syndromes, etc. As well, blood borne pathogen training should be provided by a nurse. This should occur regularly, at least annually. Training rosters should be maintained.

I was unable to verify that all officers had access to protective gear in the event of an emergency.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. The Medical Director should develop a training module for custody staff to include serious medical conditions and blood borne pathogen issues.
2. Officers should be trained and their training should be verified in a tracking log.
3. At the next inspection protective gear for officers will be evaluated.

**10.** *Record Keeping.*

   **a.** *LCJ shall ensure that medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmates at LCJ.*

   **b.** *LCJ shall develop and implement policies, procedures, and practices to ensure timely responses to orders for medications and laboratory tests. Such policies, procedures, and practices shall be periodically evaluated to ensure timely implementation of clinician orders.*

   **c.** *LCJ shall ensure that medical and mental health records are centralized, complete, accurate, readily accessible, and systematically organized. All clinical encounters and reviews of inmates should be documented in the inmates' records.*

   **d.** *To ensure continuity of care, LCJ shall submit appropriate medical information to outside medical providers when inmates are sent out of LCJ for medical care. LCJ shall obtain records of care, reports, and diagnostic tests received during outside appointments in a timely fashion and include such records in the inmate's medical record or document the inmate's refusal to cooperate and release medical records.*

   **e.** *LCJ shall maintain unified medical and mental health records, including documentation of all clinical information regarding evaluation and treatment.*

**OVERALL COMPLIANCE RATING:    PARTIAL COMPLIANCE**

**ASSESSMENT:**

There is an electronic medical record but it is incompletely installed.  Apparently, this software was not installed with participation of medical staff.  Requirements were not established and needless to say this resulted in a less than adequate functional record.  The electronic record lacks an interface with Spillman, the correctional database.  As well, there are no interfaces with the laboratory or the pharmacy software.  As a result, laboratory results are handled manually and are often not timely reviewed.  I reviewed the folder in which these manual results are kept and in one chart I reviewed a lab indicating a serious medical problem wasn't reviewed for weeks.

Medications are mostly ordered by nurses.  There is no system in the electronic record that can document signature of a physician for a verbal order.  There is also no interface with the

pharmacy. I asked for a list of persons on medication and received a list of more than 2300 persons. This is more people than are in the jail. This indicated that the pharmacy does not know who is in the jail.

Many of the processes of the jail are not supported by medical record functionality. Typically, installation of a record is started by developing a list of requirements of the organization. These functional requirements are then built into and designed into the medical record. Interfaces with other software are developed and people are trained. None of these were accomplished with the installation of CorrectTek, the electronic record. Training was so poor that most staff train themselves and then train each other. As a result, the software is not used in a standardized manner.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. The CorrectTek company should re-install the software starting with a requirements list and development of modules specific for processes in place at the facility. Training commensurate with the state of knowledge of the staff should occur in the go-live.
2. Interfaces with Spillman, the pharmacy software, and with the laboratory and any other key software should be put in place.
3. Staff dedicated to maintenance should be hired and training staff should be in place when new employees start work.
4. A system of reporting and tracking software issues should be instituted to ensure that software problems are solved.
5. A report line should be available to call in the event a software problem occurs.
6. A manual back up system should be in place in the event the software goes down. Instructions in the event software crashes should be documented in a "down time procedure".

*11.*     *Medication Administration.*

      *a.*     *LCJ shall ensure that inmates receive necessary medications in a timely manner.*

      *b.*     *LCJ shall develop policies and procedures to ensure the accurate administration of medication and maintenance of medication records. LCJ shall provide a systematic physician review of the use of medication to ensure that each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.*

      *c.*     *LCJ shall ensure that medicine administration is hygienic, appropriate for the needs of inmates, and is recorded concurrently with distribution.*

      *d.*     *LCJ shall ensure that medication administration is performed by Qualified Nursing Staff who shall administer prescription medications on a directly-observed basis for each dose, (unless the physician's order notes that the inmate can self-administer the medication), shall not discontinue medications without*

*a physician's order, and shall accurately document medication orders as being ordered via telephone. Qualified Nursing Staff shall practice within the scope of their licensures.*

e.    *When LCJ has advance notice of the discharge of inmates with serious medical or mental health needs, LCJ shall provide such inmates with at least a seven-day supply of appropriate prescription medication, unless a different amount is deemed medically appropriate, to serve as a bridge until inmates can arrange for continuity of care in the community. LCJ shall supply sufficient medication for the period of transit for inmates who are being transferred to another correctional facility or other institution. LCJ shall prepare and send with transferring inmates a transfer summary detailing major health problems and listing current medications and dosages, as well as medication history while at LCJ. LCJ shall ensure that information about potential release or transfer of inmates is communicated to Qualified Medical and Mental Health Staff as soon as it is available.*

f.    *LCJ shall create a formal mechanism, such as a Pharmacy and Therapeutics Committee, to assist in creating guidelines for the prescription of certain types of medications.*

g.    *LCJ shall ensure that Qualified Medical Staff counsels all patients who refuse medication.  See also Section B.4.b of the SA.*

h.    *LCJ shall secure the medication room and discontinue allowing food to be stored in the medication refrigerator.*

**COMPLIANCE ASSESSMENT:   NON COMPLIANCE**

**ASSESSMENT:**

Whether individuals get their medication timely is not audited.   An electronic Medication Administration Record is in place.   The quality improvement committee should attempt to identify a way to obtain data from the record indicating time of prescription to time of delivery of medication.

There are only boiler plate policies.  Nurses who administer medication told me that they are unaware of a policy or procedure for the administration of medication.  The existing practice for initiating and renewing medication mostly depends on nursing staff to order medication.  The degree of physician noninvolvement is staggering.  It does not appear, based on documentation available, that physicians are involved at all in prescription of medication.  Almost all medication is prescribed by verbal order; with nurses ordering medication.  This is unacceptable.

Only LPNs or RNs are assigned to administer medication.   The actual administration of medication appeared to be in accordance with the 5 rights and was hygienic.  One exception is that nurses will give inmates a days worth of medication in their hand as unpackaged pills.

Inmates are allowed to take this medication back to their tier and take it later.  This process is in place for psychotropic medications and is typically an unacceptable practice.  Credential data was available and maintained by MedStaff indicating up to date licensure of nurses.  Renewal of medication is supposed to be done in clinic.  All prescriptions have an automatic "pop up" which shows to providers a certain time period before expiration.  When a physician or nurse orders a medication the order shows up in the eMAR.  Because there is no interface with pharmacy, the nurse obtains a list of medication orders and faxes the list of medication of all new orders daily to the pharmacy.   Verification can then be done there.  I was told that the pharmacy tracks all medication; but this information is not current because the pharmacy is not interfaced with CorrectTek.  All medications except inhalers are administered daily dose by dose.

There is no written procedure for administering medication, but the current practice for "uncomplicated" patients is that the patient is given a whole days supply in the morning in the existing package.  The inmates who are uncomplicated is determined on a case by case basis apparently by nursing staff.  No direction is provided by the Medical Director.  A "split and watch" system consists of actually watching inmates ingest their medication.  Many more patients should be on a watch-take basis, particularly for psychotropic medications.  The facility has almost no keep on person program with the exception of inhalers.  This would be a labor saving system.

Upon discharge from jail patients get 7 days of medication if the nurse knows a patient is leaving and if the patient presents to nursing.  Practically, I found no way to verify whether this occurs as this activity is not documented or tracked.  Nurses don't always know people are leaving.  When people leave to prison, the nurses get variable notice.  When they are timely notified they prepare a medication list.  If nurses are sent a release from the prison, the jail will send a copy of the record.  HIPPA does not require patient consent when a jail provides confidential medical information to a prison.  The medication packaging received from the pharmacy is acceptable.  It takes about two hours a week to sort weekly cycle fill medication from the pharmacy.  This is acceptable.

There is no formal P & T committee.

For people who refuse medication, there is no policy or procedure for what should happen.  Every nurse is left to determine their own procedure for what to do if an inmate refuses medication.  For refusals, some nurses send an electronic message to the provider.  The provider can send a message back to the nurse but if that nurse is on vacation the directions from the provider may be lost until the nurse returns.   This process should be standardized and documented in a policy and procedure.

Carts are left in a medical administration area which is similar to a lobby.  Controlled substances are in a locked box within a locked medication cart.  However inmates and civilian staff do walk amidst these carts.  These carts should be stored in a secured area to which inmates do not have access.  Medication is stored in multiple areas including: intake, in carts, and in medication rooms and in the emergency drug kit (EDK) room.  The EDK room has a locked box for holding personal control substances that inmates bring in with them.  Scheduled drugs come in patient specific 7 day allotments.  All other drugs also come in 7 day increments.  There are significant

returns to pharmacy because inmates leave before completing taking all of their medication. The fact that so many returns to pharmacy occur is testament of the failure of delivering a 7 day supply of medication to patients who leave the facility. If patients were given a 7 day supply of medication upon leaving, there would be nothing to return to pharmacy. No one specifically is responsible for the med room. The medication room was not orderly. Some medication was stored on the floor which is unacceptable. The room was cluttered and not particularly clean.

**RECOMMENDATION FOR THE NEXT 6 MONTHS:**

1. Physicians must prescribe medication; not nurses. It must be obvious that this is occurring. Documentation of verbal orders must occur so it is obvious in the record that physicians are prescribing medication.
2. An interface with pharmacy should be established.
3. The quality committee should develop a mechanism to establish the average time from prescription to delivery of medication to the patient.
4. Policies and procedures must be developed for medication administration and storage of medication. Staff must receive regular training on these policies and procedures.
5. The Medical Director must establish what medication must be given dose by dose and what can be given to the patient to take themselves. If medication is given to an inmate to take later, it must be in packaging by pharmacy.
6. Medication administration must be standardized.
7. The procedure for handling refusals of medication must be standardized and developed into policy and procedure.
8. Storage of medication carts should be in a secured area, away from civilians and inmates.
9. The medications rooms should be cleaned.

*12.*       *__Medical Facilities.__*

    *a.*       *LCJ shall ensure that sufficient clinical space is available to provide inmates with adequate medical care services including:*

        *(1)*       *intake screening;*
        *(2)*       *sick call;*
        *(3)*       *physical assessment; and*
        *(4)*       *acute, chronic, emergency, and speciality medical care (such as geriatric and pregnant inmates).*

    *b.*       *LCJ shall ensure that medical areas are adequately cleaned and maintained, including installation of adequate lighting in medical exam rooms. LCJ shall ensure that hand washing stations in medical areas are fully equipped, operational and accessible.*

    *c.*       *LCJ shall ensure that appropriate containers are readily available to secure and dispose of medical waste (including syringes and sharp medical tools) and hazardous waste.*

   **d.     LCJ shall provide for inmates' reasonable privacy in medical care, and maintain confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations.**

**OVERALL COMPLIANCE RATING:     NON COMPLIANCE**

**ASSESSMENT:**
The area for medical and mental health screening in intake is inadequate.  Privacy does not exist. I watched intake on two inmates.  There was no privacy at all.  The EMTs had to move twice to various areas in an attempt to obtain privacy which was not ultimately obtained.  Officers stand nearby listening to intake evaluations.  I witnessed up to six officers joking and talking loudly within a few feet of the EMT who was trying to conduct a confidential interview.  I don't see how under these circumstances that a confidential interview can occur.  Intake evaluations should occur in a private clinical setting with an examination table, light, and sufficient equipment.  This does not now occur.

There is a single examination room for the entire jail.  This room consists of a large room with side by side examination tables.  Officers congregate in this room and sit in close proximity to where physicians are evaluating inmates.  The room is cluttered, equipment is not close by, and there is no privacy.  Given the number of evaluations necessary to accomplish in the jail, this is inadequate space.  For each provider expected to be conducting evaluations there should be a clinic examination room of approximately 100-120 square feet.  Each room should have an electronic record terminal, an examination table with unfettered access so that an examiner can walk around the table, easily accessible oto-ophtalmoscope, a sink to wash hands, accessible blood pressure cuffs and other necessary equipment.  I estimate that at least 6 examination rooms are necessary.

Sick call evaluations are occurring cell-side.  These are not private examinations.  In aggregate neither sick call, chronic illness, intake, nor primary care physician visits occur in privacy in an adequate room.

There is no infirmary in the jail.  Therefore, housing for inmates with disabilities and for those with special medical needs does not exist.  The Medical Director should confer with the Sheriff and consider options for how these patients can be safely maintained in appropriate housing that accommodates their medical or mental health condition.

**RECOMMEDNATIONS FOR THE NEXT 6 MONTHS:**

   1.  An evaluation room for medical and mental health intake evaluations must be established which permits for both security and privacy concerns.
   2.  Adequate clinical examination rooms need to be built for sick call request evaluations by nurses and for routine clinic examinations by providers.
   3.  Develop a plan for medical and mental health infirmary care housing.

*13.     **Specialty Care.***

**a.** *LCJ shall ensure that inmates whose serious medical or mental health needs extend beyond the services available at LCJ shall receive timely referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.*

**b.** *LCJ shall ensure that inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments and transported to their appointments. Inmates awaiting outside care shall be seen by Qualified Medical Staff as medically necessary, at intervals of no more than 30 days, to evaluate the current urgency of the problem and respond as medically appropriate.*

**c.** *LCJ shall maintain a current log of all inmates who have been referred for outside specialty care, including the date of the referral, the date the appointment was scheduled, the date the appointment occurred, the reason for any missed or delayed appointments, and information on follow-up care, including the dates of any future appointments.*

**d.** *LCJ shall ensure that pregnant inmates are provided adequate pre-natal care. LCJ shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment, and management of high risk pregnancies.*

**OVERALL COMPLIANCE RATING:    NON COMPLIANCE**

**ASSESSMENT:**

In discussions with providers, it did not appear that visits to specialty clinics are timely.  One example was a current inmate who had a potential threatened abortion for whom the provider could not get an appointment.  Movement officers are not readily available so transportation is not based on need of the inmate but on the availability of an officer.  This is not tracked so the exact situation is not known.

Inmates who are waiting for outside appointments that are delayed are not scheduled routinely to be seen by providers.  It is uncommon for providers to see patients either before or after their appointment. This is due to lack of provider time.

Tracking of specialty appointments is performed.  I did not verify whether tracking is specifically in accordance with the agreement.

Pregnancy care is unacceptable.  There is a contract obstetrician but it is difficult to get an appointment even for problematic cases.  There is no policy or procedure delineating care of the pregnant woman.  Currently, pregnant women are placed on a special diet but there is no special housing provided.  Providers do not routinely see a pregnant woman.  Given that it is difficult to get appointments with the obstetrician, a pregnant woman may not see a qualified provider for weeks.  Labs done at the obstetrician are not in the medical record at the facility so the providers

at the facility will not know if the pregnancy is complicated or if there is something they need to be aware of. I was told that typically, pregnant women leave the jail before being seen. This is both a liability and a patient safety issue and should be corrected.

For one chart I reviewed, the pregnant inmate had a medical condition complicating her pregnancy and her appointment was so late that she developed a problem and had to be sent to a hospital before her appointment occurred. Her medical condition may cause a problem with her in utero fetus possibly causing fetal abnormalities.

Another chart reviewed was for a pregnant woman who had asthma complicating her pregnancy. She had not been seen for her asthma even though asthma can potentially be problematic in pregnancy. An appointment for the obstetrician was ordered on April 20 but was not scheduled until late in May. Pregnant women should be seen within a week of incarceration.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Specialty appointments should be tracked and reviewed by the Quality Improvement Program. The time from provider order to the appointment should be tracked and reviewed for appropriateness by the Medical Director.
2. Sufficient officer staffing should be assigned to transport patients for scheduled appointments.
3. Persons who fail to go to a scheduled appointment should be tracked and the reason for the missed appointment should be provided. This information should be provided to the Sheriff on a regular basis.
4. Pregnant females should be evaluated by an obstetrician within a week of incarceration. Prenatal lab tests can be performed routinely upon incarceration so that they will be available to the obstetrician and primary care providers at the facility.
5. Information from the obstetrician should be exchanged with the medical staff at the jail and scanned into the medical record.
6. Someone on site should be capable of performing a routine pregnancy visit for pregnant females so that care can be managed along with the obstetrician.

**14.**   *Staffing, Training and Supervision.*

　　a.　*LCJ shall ensure that its health care structure is organized with clear lines of authority for its operations to ensure adequate supervision of the system's health care providers.*

　　b.　*LCJ shall maintain sufficient staffing levels of Qualified Medical Staff and Qualified Mental Health Staff to provide care for inmates' serious medical and mental health needs. See also Section B.1 of the SA.*

　　c.　*LCJ shall ensure that all Qualified Medical Staff and Qualified Mental Health Staff are adequately trained to meet the serious medical and mental health needs of inmates. All such staff shall receive documented orientation and in-service training on relevant topics, including identification of inmates in need*

> *of immediate or chronic care, suicide prevention, and identification and care of inmates with mental illness. LCJ shall ensure that all other medical and mental health staff receive adequate training to properly implement the provisions of this Agreement.  See also Section C.4 (Suicide Prevention Training) of the SA.*

    **d.**    *LCJ shall ensure that Qualified Medical Staff receive adequate physician oversight and supervision.*

    **e.**    *LCJ shall ensure that all persons providing medical or mental health treatment meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. Upon hiring and annually, LCJ shall verify that all medical or mental health staff have current, valid, and unrestricted professional licenses.*

    **f.**    *LCJ shall ensure that correctional officers are adequately trained in identification, timely referral, and proper supervision of inmates with serious medical needs. LCJ shall ensure that correctional officers are trained to understand and identify the signs and symptoms of drug and alcohol withdrawal and to recognize and respond to other medical urgencies.*

    **g.**    *LCJ shall ensure that correctional officers receive initial and periodic training on basic mental health information (e.g., recognizing mental illness, specific problematic behaviors, additional areas of concern); recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual. See also Section C.4 of the SA.*

**OVERALL COMPLIANCE RATING:     NON COMPLIANCE**

**ASSESSMENT:**

The Table of Organization and lines of authority are not clear now.  This program is evolving and isn't firmly established.  Dr. Farley is now the Medical Director but hasn't yet seen patients. The lines of authority need to be clarified to line staff who are unaware of who is in charge.  A town hall type meeting would be useful at this juncture.

The staffing levels have not been determined by functional need.  The existing staff level was determined in 2006.  It was based on a mutual agreement between Dr. Gutierrez, a consultant to the County and the owner of MedStaff and on what the County Commission could afford.  The staffing matrix was based on historical staffing not on the functional need of the facility.  The original matrix was for 900 hours of staff time and has been raised to 1176 hours since then. Everyone I spoke with from management to line staff agreed that there is insufficient staffing for the functional needs of this program.  Existing statistical information may not be totally accurate; nevertheless, it does point to a need for more staff.  There are about 1200 intakes a month.

Typically 30% will have some medical condition meaning that there are about 360 chronic illness or urgent care visits that should follow from intake. All 1200 should have a 14 day assessment. There are about 1200 medical card evaluations a month. Discounting chronic illness visits this results in approximately 1200 nursing evaluations and about 1600 provider visits a month. More Registered Nurse and provider hours are indicated. Better statistical data could be obtained for functional requirements.

Actual staffing levels were reviewed. They are inadequate. The current matrix calls for 8.4 FTE of LPN coverage; 2.4 FTE of RN coverage; 20 hour of physician coverage; and 1.6 FTE of mid level provider coverage. This is inadequate coverage.

There is no fixed orientation programs except to assign staff to various units and demonstrate to them current practice. No policy review occurs because no functional policies exist. Training is non existent, including training for the electronic medical record.

The current Medical Director has just started. However, there has been no physician oversight over this program. In the past, physicians were onsite only 4 hours a week. As a result, many standing orders were in place and nurses were basically allowed to practice and even order medication without physician supervision.

Nurses have licensure tracked by MedStaff. There was no credentialing process for providers. This should include credentialing similar to what is seen in a hospital. Mid Level providers should have their collaborating physician or supervising physician noted in their credential packet. All physician licenses and training should be evident in the credential packet.

Training of officers did occur in the past for certain mental health issues but I could not verify that this is occurring for medical items in the agreement. Training in accordance with terms of this agreement should be provided and the list of officers who received the training should be tracked.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. A table of organization and organizational structure needs to be put into place as soon as possible.
2. The organizational structure and leadership structure must be communicated to all staff. I recommend a town hall format for this.
3. A proper orientation program should be put into place for all employees. This should include orientation to policies and procedures, security rules, and training necessary for functional competency (electronic record training, OSHA training, etc.)
4. The Medical Director must establish clinical authority and clinical supervision over the program. Mid-level providers must be supervised. Nurses must not be allowed to practice with standing orders with few exceptions.
5. A staffing analysis must be performed. This should be performed after policies and procedures are complete as the procedures will determine the functional requirements (and therefore staffing levels) of the program.
6. Provider credentialing must be put into place.

7. Officer training must be tracked including name of officer, dates training occurred, and type of training given.

**15.** *Dental Care.*

    *a.*     *LCJ shall ensure that inmates receive adequate dental care, and follow up. Such care should be provided in a timely manner. Dental care shall not be limited to extractions.*

    *b.*     *LCJ shall ensure that adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.*

**OVERALL COMPLIANCE RATING:     NON COMPLIANCE**

**ASSESSMENT:**

The dentist only comes on Fridays for about 4 hours.  There was no one to interview who could inform me of dental matters.  The waiting time to see a dentist was about 4 weeks.  Typically, in correctional facilities, one FTE dentist is required for every 800-1000 patients.  This is not a hard and fast rule.  I will need to verify dental statistics at the next visit and will need to speak with the dentist.

**RECOMMENDATIONS FOR THE NEXT SIX MONTHS:**

1. Dental requests must be tracked in a manner similar to health service requests.
2. Patients with dental pain should not exceed a week in waiting.
3. Dental complaints with pain or infection must be evaluated by medical staff pending an appointment with the dentist.

**16.** *Mortality Reviews.*

    *a.*     *LCJ shall request an autopsy, and related medical data, for every inmate who dies while in the custody of LCJ or under medical supervision directly from the custody of LCJ.*

    *b.*     *LCJ shall conduct a mortality review for each inmate death while in custody and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Mortality and morbidity reviews shall involve physicians, nurses, and other relevant LCJ personnel and shall seek to determine whether there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention. Mortality and morbidity reviews shall occur within 30 days of the incident or death, and shall be revisited when the final autopsy results are available. At a minimum, the mortality and morbidity reviews shall include:*

(1) *critical review and analysis of the circumstances surrounding the incident;*

(2) *critical review of the procedures relevant to the incident;*

(3) *synopsis of all relevant training received by involved staff;*

(4) *pertinent medical and mental health services/reports involving the victim;*

(5) *possible precipitating factors leading to the incident; and*

(6) *recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.*

c.  *LCJ shall address any problems identified during mortality reviews through timely training, policy revision, and any other appropriate measures.*

**OVERALL COMPLIANCE RATING:    NON COMPLIANCE**

**ASSESSMENT:**

There has been one recent death.  I could not verify that an autopsy had occurred.  I was told that there is no mortality review and no mortality review committee.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. A mortality review committee should be established as part of the Quality Improvement Committee.
2. Custody, mental health and medical should participate in these reviews.
3. The review should result in a document that gives recommendations for improving aspects of care that were deficient as identified in the mortality review.

**B.  MENTAL HEALTH CARE:  Settlement Agreement Part III Section B**

*1.  LCJ shall provide adequate services to address the serious mental health needs of all inmates, consistent with generally accepted correctional standards of care, including sufficient staffing to meet the demands for timely access to an appropriate mental health professional, to ensure qualified mental health staff perform intake mental health screenings and evaluations, and to perform comprehensive assessments and comprehensive multidisciplinary treatment planning. See Section III. A.*

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

Currently, there are only two (2) qualified mental health professionals (QMHP) working within the LCJ.  One is a masters-level, licensed clinician, the other, a part-time psychiatrist whose hours were recently raised to 16 hours per week.

In February 2011, Edgewater Systems (the mental health provider) was authorized to hire 6 *additional* QMHP staff that could be licensed either inside or outside the state of Indiana. As of April 2011, Edgewater has still had difficulty recruiting QMHP staff and, therefore, was tentatively given permission to increase the salaries of these new positions while reducing the number of additional QMHP staff to five (5). One of these QMHP positions will be designated as the Clinical Supervisor for the mental health program and be directly responsible for providing clinical supervisor to all mental health staff (with the exception of the psychiatrist). Edgewater has given the County assurances that all QMHP positions will be completely filled by June 2011.

In addition, beginning in March 2011, Edgewater hired seven (7) "residential technicians" (RTs) to provide primary observation of inmates on suicide precautions and/or mental health observation on the 4th floor.

Finally, Edgewater currently employs three (3) "crisis intervention specialists" (CISs) at the LCJ that fit the DOJ settlement agreement's definition of Qualified Mental Health Staff. These CIS staff currently work in the booking area and conduct intake mental health screening (see Provision B.2.c). There are also two (2) other QMHS, one of which is the Administrative Mental Health Manager, and the other staff works on the 4th floor in a variety of roles.

In sum, as of April 25, 2011, the current mental health staffing at the Lake County Jail is as follows:

- 2 QMHPs (including .4 FTE psychiatrist)
- 5 QMHPS (unfilled, including clinical supervisor)
- 7 Residential Technicians
- 3 Crisis Intervention Specialists
- 2 QMHS

In conclusion, current QMHP staffing is woefully inadequate to fulfill the requirements if this provision but the County is hopeful that these five (5) new QMHP positions will be filled by June 2011.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Fill the vacant positions.

**ADDITIONAL INSTRUCTIONS/DOCUMENTS FOR NEXT TOUR:**

1. If the positions are not filled, provide relevant information re: recruitment efforts to fill the positions.

**2.** **_Timely and Appropriate Evaluation of Inmates._**

   **a.** **_LCJ shall develop and implement policies and procedures to provide adequate screening to properly identify and assess inmates with mental illness, and evaluate inmates' mental health needs. See also Section III.A.2._**

**OVERALL COMPLIANCE RATING:  NON- COMPLIANCE**

**ASSESSMENT:**

Edgewater Systems previously developed a *Health Services Division-Lake County Jail-Policy and Procedure Manual*, last revised in June 2010 that included many policies and procedures addressing National Commission on Correctional Health Care standards. Some of mental health policies include mental health screening and mental health evaluation; health evaluation of inmates of segregation; mental health services; suicide prevention; medical restraints and therapeutic seclusion; and forced psychotropic medication.

A review of the Edgewater *Manual* determined that many of these policies and procedures will need to be substantially rewritten in order to be in compliance with this DOJ Settlement Agreement, and incorporated into the Lake County Jail policy manual. The suicide prevention policy has been substantially revised and scheduled to be implemented in June 2011.  It should be noted that Med-Staff, Inc. (the medical provider) previously developed a *Health Services Division-Lake County Jail-Policy and Procedure Manual*, last revised in January 2009 that included many policies and procedures addressing National Commission on Correctional Health Care standards.  This document will not be utilized in the development of mental health policies and procedures for the LCJ.

In general, policies and procedures are either missing or outdated.  Mental health policies and procedures should include the following topic areas:

1. Mission and goal
2. Administrative structure
3. Staffing (i.e., job descriptions, credentials, and privileging)
4. Reliable and valid methods for identifying inmates with severe mental illnesses (i.e., receiving screening, intake mental health screening, mental health evaluations)
5. Treatment programs available
6. Involuntary treatment including the use of seclusion, restraints, forced medications, and involuntary hospitalization
7. Other medicolegal issues including informed consent and the right to refuse treatment
8. Limits of confidentiality during diagnostic and/or treatment sessions with pertinent exceptions described
9. Mental health record requirements
10. Quality assurance and/or improvement plan
11. Training of mental health staff regarding correctional and/or security issues
12. Formal training of correctional staff regarding mental health issues
13. Research protocols

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Develop/revise policies and procedures as summarized above.

   ***b. LCJ shall ensure that the intake health screening process referred to in Section***

*III.A.2 includes a mental health screening, which shall be incorporated into the inmate's medical records. LCJ shall ensure timely access to a Qualified Mental Health Professional when presenting symptoms of mental illness require such care.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

Both the medical and mental health/suicide risk screening processes are automated and intake staff generates documentation that goes directly into CorrecTek, the electronic medical record. However, given current mental health staffing levels, there is not always timely access to a QMHP upon referral from intake.  See Section B.2.c below.  A practice is currently in place relevant to the mental health intake screening although a policy and procedure has not yet been developed.  Due to staffing allocation issues, such screening is reportedly completed within 24 hours by a crisis prevention specialist (CIS).  However, this process has not yet been audited.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Develop and implement the relevant policy and procedure.
2. Following implementation, audit the process.

   *c.*   *LCJ shall ensure that the mental health intake screening process includes inquiry regarding:*

   *(1)*   *past suicidal ideation and/or attempts;*
   *(2)*   *current ideation, threat, or plan;*
   *(3)*   *prior mental illness treatment or hospitalization;*
   *(4)*   *recent significant loss, such as the death of a family member or close friend;*
   *(5)*   *history of suicidal behavior by family members and close friends;*
   *(6)*   *suicide risk during any prior confinement;*
   *(7)*   *any observations of the transporting officer, court, transferring agency, or similar individuals regarding the inmate's potential suicide risk;*
   *(8)*   *medication history; and*
   *(9)*   *drug and alcohol withdrawal history.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

The County has an intake screening process for the identification of inmates with mental illness and/or at risk for suicide, but the process is in need of corrective action. All newly admitted inmates are screened at booking by an Emergency Medical Technician (EMT) utilizing a Medical History and Screening form. Data from the form is directly entered into CorrecTek. EMT personnel are on-site in the Lake County Jail 24/7. In addition, all newly admitted inmates

were previously screened at booking by a Crisis Intervention Specialist (CIS) utilizing a Mental Health Evaluation form. Data from this form was entered directly into CorrecTek. CIS personnel are on-site 24/7, with the exception of Sunday.  In the absence of CIS staff on Sundays, mental health intake screening is delayed until the following morning. The County is aware that this practice is problematic and potentially dangerous, and working toward a corrective action.

In addition, the Mental Health Evaluation form contained many, but not all, of the nine (9) items listed above in this Provision. CIS personnel were previously directed that when an inmate answered affirmatively to any of the three suicide risk-related questions, they were to then complete a separate 17- item Suicide Assessment form. In an effort to streamline the process and ensure that all nine of the above items are adequately covered during the intake screening process, the County has introduced a new Mental Health/ Suicide Risk Intake Screening Form that includes 17 areas of inquiry, observation of mental status, and a disposition section. The new form was recently introduced during the week of April 18, 2011.  CIS will now be responsible to check the alert screen of CorrecTek in determining whether the newly admitted inmate was a suicide risk during a previous LCJ confinement.

Although appropriate intake screening instruments are in place, corresponding policies and procedures need to be developed and/or revised.  The County will work with either Med-Staff or Edgewater to ensure that the new Mental Health/ Suicide Risk Intake Screening Form is provided to newly admitted inmates on Sundays.

Finally, the drug and alcohol withdrawal history should be obtained via the medical history and screening intake form performed by the EMTs.  However, this form needs to be revised to include such a history.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. As in Section B.2a of the SA.
2. Revise the medical history and screening intake form as above and include the drug and alcohol withdrawal history.

*3.*     <u>*Assessment and Treatment.*</u>

    *a.*     *LCJ shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake screening process, or who is otherwise referred for mental health services, receives a comprehensive mental status evaluation in a timely manner from a Qualified Mental Health Professional (immediate for emergent issues, within <u>24 hours</u> of referral for an expedited comprehensive evaluation, or <u>72 hours</u> of referral for a routine comprehensive evaluation). The comprehensive mental health evaluation shall include a recorded diagnosis section, including a standard five-Axis diagnosis from DSM-IV-TR, or subsequent Diagnostic and Statistical Manual of the American Psychiatric Association. If Qualified Mental Health Staff find a serious mental illness, they shall refer the inmate for appropriate treatment. LCJ shall review available information regarding any diagnosis made by the inmate's community*

*or hospital treatment provider, and shall account for the inmate's psychiatric history as a part of the assessment. LCJ shall adequately document the comprehensive mental status evaluation in the inmate's medical record.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**
Given current QMHP staff levels, compliance with this Provision remains problematic.  Inmates are not always provided with timely mental health evaluations and the above required three-level response of immediate, within 24 hours, and 72 hours is not being met.  Although the psychiatrist had previously developed a Psychiatric Evaluation form that is consistent with the Settlement Agreement's requirement of a mental health evaluation, the form has not been consistently utilized, particularly by the other QMHP staff member.  Furthermore, the current vacancies result in lack of compliance with the relevant timeframes and the lack of the relevant policy and procedure contributes to inconsistent.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Develop and implement the relevant policy and procedure.
2. Following implementation, audit the process.

> *b. LCJ shall ensure adequate and timely treatment for inmates whose assessments reveal serious mental illness, including timely and appropriate referrals for specialty care and regularly scheduled visits with Qualified Mental Health Professionals.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

Although the County and its consultants have not had an opportunity to verify through an auditing review as to whether identified inmates are receiving timely and appropriate referrals for specialty care, given current QMHP staff levels, compliance with this Provision remains problematic.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Develop and implement the relevant policy and procedure.

> *c. LCJ shall ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses.*

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

Mental health clinicians are not currently developing treatment plans that adequately address inmates' mental health needs.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Develop and implement the policy and procedure relevant to treatment plans.

> **d.  LCJ shall provide for an inmate's reasonable privacy in mental health care, and maintain confidentiality of inmates' mental health status, subject to legitimate security concerns and emergency situations.**

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

The County is aware that privacy and confidentiality is problematic within the Lake County Jail, particularly within the booking area during the intake screening process, and on the 4th floor when mental health staff are assessing inmates on suicide precautions.  The County is currently looking at different options to reconfigure the booking area to allow both EMT and CIS staff sufficient privacy for conducting confidential intake screenings to newly admitted inmates. With regard to the 4th floor medical/mental health unit, current practice is for mental health staff to typically conduct "cell-front" assessments of inmates on suicide precautions and/or mental health observation status.  The County acknowledges that this practice is problematic with the issues of privacy and confidentiality, and has identified visiting booths on the 4th floor that can safely be utilized for the assessment of inmates by mental health staff.  Unless contraindicated by security concerns, mental health staff will be encouraged to utilize these rooms on a regular basis.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Develop and implement the relevant policy and procedure regarding privacy of clinical contacts.

> **e.  LCJ shall provide adequate on-site psychiatric coverage for inmates' serious mental health needs and ensure that psychiatrists see such inmates in a timely manner.**

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

As of February 2011, on-site psychiatric coverage was increased to 16 hours per week.  On-call psychiatric service is also provided as needed.  It was reported that there were currently 100 to 165 inmates receiving psychotropic medications at the LCJ. The lack of an accurate or consistent number is concerning for many reasons, including need assessment purposes. It is extremely likely that 16 hours per week of on-site psychiatric coverage is inadequate for the needs of the jail population.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Develop an accurate management information system relevant to the mental health caseload at the LCJ.
2. Provide accurate statistics relevant to inmates on the mental health caseload at LCJ.

> *f. LCJ shall ensure timely and appropriate therapy, counseling, and other mental health programs for all inmates with serious mental illness. This includes adequate space for treatment, adequate number of Qualified Mental Health Staff to provide treatment, and an adequate array of structured therapeutic programming.*

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

Given current QMHP staff levels, compliance with this provision remains problematic. To date, there is little, if any, therapy and counseling occurring, or at a minimum, that which is adequately documented.  There is not an adequate array of structured therapeutic programming.

The County and Edgewater have renovated several areas on the 4th floor for adequate office space for existing and anticipated new mental health staff.  Most housing units already have existing space adequate for group treatment.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Fill the remaining QMHP vacancies.
2. Provide information relevant to treatment modalities being provided to inmates and how many inmates are receiving such treatments.

> *g.    LCJ shall ensure mentally ill inmates in segregation receive timely and appropriate treatment, including completion and documentation of regular rounds in the segregation units at least once per week by adequately trained Qualified Mental Health Professionals in order to assess the serious mental health needs of inmates in segregation. Inmates with serious mental illness who are placed in segregation shall be immediately and regularly evaluated by a Qualified Mental Health Professional to determine the inmate's mental health status, which shall include an assessment of the potential effect of segregation on the inmate's mental health. During these regular evaluations, LCJ shall evaluate whether continued segregation is appropriate for that inmate, considering the assessment of the Qualified Mental Health Professional, or whether the inmate would be appropriate for graduated alternatives.*

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

Given current QMHP staff levels and deficient practices, compliance with this Provision remains very problematic. Currently, the Administrative Mental Health Manager conducts weekly rounds in segregation, and documents interaction with inmates on the mental health caseload on a Mental Health Rounds Form in CorrecTek, but this individual is not a QMHP. In addition, the County and its consultants have not had an opportunity to verify through an auditing review as to whether all inmates, or simply those on the mental health caseload, are being seen during rounds. Further, medical staff conduct regular rounds in segregation to dispense medication, but only interact with those inmates that are scheduled to receive medication. Reportedly, inmates scheduled to see the psychiatrist, but who are housed in segregation, will <u>not</u> be seen until after they have been returned to a non-segregation housing unit. Finally, mental health staff are <u>not</u> routinely notified (and/or receive timely notification) when an inmate on their caseload has been transported to segregation, and are <u>not</u> involved in disciplinary hearings. Mental health staff reported that it was common for the correctional officers to not escort segregation inmates for clinical appointments due to their segregation status. It was unclear whether this was a staffing allocation issue or a security regulation or practice. Not surprisingly, mental health staff are <u>not</u> involved in determining if an inmate's disciplinary sanction might in any way be mitigated by their mental illness. These are all problematic areas that need attention.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

 1.  Remedy the above situation.

> ***h.  LCJ shall maintain an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication and dosages for inmates on psychotropic medications. In addition, inmate's files shall contain current and accurate information regarding any medication changes ordered in at least the past year.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

The Administrative Mental Health Manager maintains a listing of all inmates currently in the LCJ that are receiving mental health services, i.e. a mental health caseload. The County and its consultants have not had an opportunity to verify through an auditing review the accuracy of the mental health caseload. CorrecTek, the electronic medical record, should reflect each inmate's psychotropic medication and current dosages, but again, this process has not been audited.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Verify through an auditing review the accuracy of the mental health caseload.

> ***i. LCJ shall ensure that a Qualified Mental Health Professional conducts an in-person evaluation of an inmate prior to a medically-ordered seclusion or restraint, or as soon thereafter as possible. Patients placed in medically-ordered seclusion or restraints shall be evaluated on an on-going basis for physical and mental deterioration. Seclusion or restraint orders should include sufficient criteria for release.***

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

The LCJ does not have a written policy or adequate practices regarding the <u>seclusion</u> of inmates with mental illness.  LCJ's mental health provider, Edgewater's "medical restraints and therapeutic seclusion" policy does <u>not</u> address seclusion.  In practice, inmates with mental illness that are seemingly in need of seclusion are housed on the 4th floor medical/mental health unit under the cryptic description of "caution," "observation," or "1096."  There are <u>no</u> current written policies or directives that identify the behavior for which these identifications apply, nor criteria for admission/discharge from these statuses. Obviously, this is problematic and needs corrective action.

With regard to the use of <u>restraint</u>, although the current practice is that inmates in need of medical restraints are placed on a restraint bed on the 4th floor medical/mental health unit.  Both LCJ's medical provider, Med-Staff and Edgewater have written policies regarding the use of restraint.  However; both are in need of revision.  For example, neither policy addresses the specific staff member (corrections, medical, or mental health) who is responsible for providing observation of the inmate (in addition to CCTV), and the Edgewater policy fails to even mention any responsibility of QMHP staff in the process.

New policies are in the process of being drafted to eliminate inappropriate seclusion terms (i.e., "caution," "observation," or "1096"), and establish specific criteria and guidelines for seclusion. I reviewed a draft restraint policy and procedure with LCJ's mental health consultant, Mr. Hayes, and made specific recommendations regarding relevant timeframes and credentials of clinicians authorized to order restraints and/or perform relevant need for restraints assessments. I also provided a resource document relevant to the use of restraints in a correctional facility published by the American Psychiatric Association to Mr. Hayes.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Develop and implement a policy and procedure regarding the use of restraints/seclusion for mental health purposes.
2. Following implementation, audit the process.

> *j. LCJ shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates. Crisis services shall not be limited to administrative segregation or observation status. Inmates shall have access to appropriate licensed in-patient psychiatric care, when clinically appropriate.*

## OVERALL COMPLIANCE RATING:  NON-COMPLIANCE

## ASSESSMENT:

Med-Staff and Edgewater do not have adequate policies regarding psychiatric emergencies. Access to inpatient psychiatric hospitalization for clinical purposes appears to not be available.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. Develop and implement a relevant policy and procedure regarding crisis services.
2. Remedy the lack of access to an inpatient psychiatric hospitalization for clinical purposes.
3. A summary regarding efforts to remedy the lack of access to an inpatient psychiatric hospitalization for clinical purposes.

> *4.   Psychotherapeutic Medication Administration*
>
> > *a.   LCJ shall ensure that psychotherapeutic medication administration is provided when appropriate.*

## OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE

## ASSESSMENT:

As previously stated, a psychiatrist is scheduled to be on-site 16 hours per week (as of February 2011). There are also on-call psychiatric services available as needed.  Med-Staff and Edgewater do not have adequate policies regarding psychotropic medication administration, and the County and its consultants have not had an opportunity to verify through an auditing review the practices in this area.

## Recommendations for next 6 months:

1. Develop and implement the relevant policy and procedure.
2. Verify through an auditing review current practices in this area.

> *b. LCJ shall ensure that psychotropic medication orders are reviewed by a psychiatrist or physician on a regular, timely basis for appropriateness or adjustment.   LCJ shall ensure that changes to inmates' psychotropic medications are clinically justified and documented.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

As previously stated, a psychiatrist is scheduled to be on-site 16 hours per week (as of February 2011). There are also on-call psychiatric services available as needed.  Med-Staff and Edgewater do not have adequate policies regarding psychotropic medication administration.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

    1.  Develop and implement the relevant policy and procedures, which should include a policy and procedure relevant to medication non-adherence..

        ***c.  LCJ shall ensure timely implementation of physician orders for medication and laboratory tests. LCJ shall ensure inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, including movement disorders, and provide treatment where appropriate.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

As previously stated, a psychiatrist is scheduled to be on-site 16 hours per week (as of February 2011). There are also on-call psychiatric services available as needed.  Med-Staff and Edgewater do not have adequate policies regarding psychotropic medication administration.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

    1.  Develop and implement the relevant policy and procedures, which should include a policy and procedure relevant to medication non-adherence..

**C.  SUICIDE PREVENTION:  Settlement Agreement Part III Section C.**

***1.***       ***Suicide Prevention Policy.***

        ***a.***     ***LCJ shall develop policies and procedures to ensure the appropriate management of suicidal inmates, and establish a suicide prevention program in accordance with generally accepted correctional standards of care.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

The current suicide prevention program has been found to be inadequate and inconsistent with the standard of care.  The suicide prevention policy, last revised by Edgewater Systems in June

2010, was reviewed and found to be inadequate and not consistent with the required provisions of the Department of Justice Settlement Agreement (DOJSA).  It needs to be substantially revised and incorporated into the Lake County Jail policy manual.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

    1.  Approve and implement the above draft policy

    ***b.    The suicide prevention policy shall include, at a minimum, the following provisions:***

        ***(1)    an operational description of the requirements for both pre-service and annual in-service training;***
        ***(2)    intake screening/assessment;***
        ***(3)    communication;***
        ***(4)    housing;***
        ***(5)    observation;***
        ***(6)    intervention; and***
        ***(7)    mortality and morbidity review.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

As discussed above, the current suicide prevention program and policy is in the process of being substantially revised.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

    1.  Approve and implement the above draft policy

    ***c.    LCJ shall ensure suicide prevention policies include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT**

Past practices were that inmates identified as suicidal were placed on "full suicide precautions" and housed on the 4th floor of the LCJ.  "Full suicide precautions" included observation via cameras, removal of clothing, issuance of paper gowns, lock-down status, removal of all possessions and privileges.  All inmates were on this status for minimum of 72 hours.

These conditions are extremely restrictive and not conducive to individualized treatment and assessment.  The revised draft policy will remove these restrictive conditions and decisions

regarding possessions and privileges should be on a case-by-case basis by mental health staff. On-site review of the 4th floor found numerous problems. Inmates were on suicide precautions without being properly observed by correctional staff, the observation sheets on cell doors were not accurate, officers had documented checks that were not made, officers in the control booth were not consistently watching the CCTV monitors, inmates on suicide precautions had their blankets completely covering their bodies, making proper observation impossible, inmates are on suicide precautions for days and are seen infrequently by mental health staff, and progress notes in the charts do not reflect adequate documentation of a suicide risk assessment.

Beginning in March 2011, Edgewater hired seven (7) "residential technicians" (RTs) to provide primary observation of inmates on suicide prevention and/or mental health observation. When these staff are unavailable, supervision will be provided by correctional staff. Cameras will no longer be the primary means for observing, although it will be utilized as a supplemental form of supervision. These RTs have received some instruction as to their responsibilities, but have not yet been trained, and will receive a full-day of suicide prevention later this year (along with all other staff).

In addition to RTs, paper gowns have been replaced by safety smocks. The smocks will be laundered after each use with a biodegradable bag. The new policy requires that inmates on suicide precautions are required to be issued mattresses, and suicide-resistant mattresses will be ordered. Prior practices were to remove identification brackets from inmates on suicide precautions. This is contrary to the standard correctional practice and should be corrected. All inmates will be required to retain identification brackets.

Correctional staff will continue to make rounds of all 4th floor housing areas at 30-minute intervals, unless an inmate's medical needs require more frequent observation.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

    1.    Approve and implement the draft suicide prevention policy.

    *d.*    *LCJ shall ensure security staff posts in all housing units are equipped with readily available, safely secured, suicide cut-down tools.*

**OVERALL COMPLIANCE RATING: SUBSTANTIAL COMPLIANCE**

**ASSESSMENT:**

    1)    Each control booth of the Lake County Jail housing units contain a first aid kit, Ambu bag, and rescue tool (to quickly cut through fibrous material).

    2)    AEDs are strategically located throughout the facility. Additional AEDs have been purchased and will be located in key areas of the facility as determined by the director of nursing.

    3)    The director of nursing or designee will ensure that all equipment utilized in the response

to medical emergencies (e.g., emergency response bag, code cart, oxygen tank, AED, etc.) is inspected and in proper working order on a regular basis.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Continue to self-monitor.

   *e.        LCJ shall ensure that cells for suicidal inmates shall be retrofitted to render them suicide-resistant (e.g., elimination of protrusive shower heads, exposed bars, unshielded lighting or electrical sockets).*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

Currently, most inmates on suicide precautions are housed in either Section 4C or 4F on the 4th floor of old jail.  For the most part, these cells are relatively safe, although there are safety hazards that need to be corrected.  For example, the hooks on the restraint beds, clothing hooks and ceiling ventilation grates in shower area, and ceiling ventilation grates (in Section 4C) in cells (mostly in Section 4C) are conducive to tying a ligature in a hanging attempt. Because inmates on suicide precautions will be offered daily showers (pursuant to clinical judgment), these shower areas need to be suicide-resistant.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Make the appropriate retrofitting.

   *f.        LCJ shall document inmate suicide attempts at LCJ in an inmate's correctional record in the classification system, in order to ensure that intake staff will be aware of past suicide attempts if an inmate with a history of suicide attempts is readmitted to LCJ.*

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

Several provisions of the Settlement Agreement speak to the requirement that staff have knowledge of any prior suicide risk of inmates who are re-admitted to the Lake County Jail. Currently, such information is not collected, therefore, not available to either medical staff at inmate or classification staff.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Any inmate placed on suicide precautions should be tagged on the "reminder" screen within CorrecTek by mental health staff.  This information should not be deleted

when the inmate is removed from suicide precautions, nor when they are released from the facility.

2. Medical staff at intake should always review the Reminder screen on CorrecTek to verify whether the detainee was previously confined in the Lake County Jail and had any history of suicidal behavior during a prior confinement.

3. Regardless of the detainee's behavior or answers given during intake screening, a referral to mental health staff should always be initiated based on documentation reflecting suicidal behavior during an inmate's prior confinement within the LCJ.

4. Audit the above process.

## 2. *Suicide Precautions.*

    *a.*     *LCJ shall ensure that suicide prevention procedures include provisions for constant direct supervision of actively suicidal inmates and close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks). LCJ shall ensure that correctional officers document their checks.*

**OVERALL COMPLIANCE RATING: PARTIAL COMPLIANCE**

**ASSESSMENT:**

Currently, all inmates are placed on "full suicide precautions, stripped of all clothing and possessions, and issued a paper gown and safety blanket. They remain on this status for a minimum of 72 hours, regardless of risk level or lethality. They are required to be monitored by CCTV and 15-minute rounds by correctional staff. This is contrary to national correctional standards and the above provision, and in the process of being revised.

The revised suicide prevention policy includes descriptions of the type of behavior and/or circumstances that necessitates "close observation" and "constant observation." The draft policy includes two levels of observation and reads as follows:

    **Close Observation** is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation and/or has a recent prior history of self-destructive behavior and would be considered a low risk for suicide. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. This inmate should be observed by staff at staggered intervals not to exceed every 10 minutes, and should be documented as it occurs.

    **Constant Observation** is reserved for the inmate who is actively suicidal, either by threatening or engaging in self-injury and would be considered a high risk for suicide. This inmate should be observed by an assigned staff member on a continuous, uninterrupted basis. The observation should be documented at 10-minute intervals.

Cameras can be utilized as a supplement to, but never as a substitute for, these observation levels.  In addition, there are inmates on "caution" status in the 4th floor cells.  This status needs to be specificity identified as either a medical or mental health observation.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1.  Approve and implement the suicide prevention policy.

   ***b.***   ***LCJ shall ensure that when staff initially place an inmate on Suicide Precautions, the inmate shall be searched and monitored with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and writes appropriate orders. Until such an assessment, inmates shall be placed in gowns recommended and approved for use with suicidal patients.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

Most of these requirements are currently being practiced, but the suicide prevention policy is in need of revision.  Safety smocks have been purchased and are now distributed; use of paper gowns has been discarded.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1.  Approve and implement the previously referenced draft suicide prevention policy.

   ***c.***   ***LCJ shall ensure that, at the time of placement on Suicide Precautions, Qualified Medical or Mental Health Staff shall write orders setting forth the conditions of the watch, including but not limited to allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances.***

**Overall Compliance Rating:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

As previously stated, the current management of suicidal inmates within the Lake County Jail system is overly restrictive.  Confining a suicidal inmate to their cell for 24 hours a day only enhances isolation and is anti-therapeutic.  Under these conditions, it is also difficult, if not impossible, to accurately gauge the source of an inmate's suicidal ideation.  As such, the suicide prevention policy has been revised and contains the following:

- All decisions regarding the removal of an inmate's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be commensurate with the level of

suicide risk *as determined on a case-by-case basis by mental health staff*;

- If mental health staff determine that an inmate's clothing needs to be removed for reasons of safety, the inmate shall always be issued a safety smock *and safety blanket*;

- All inmates on suicide precautions shall be allowed all routine privileges (e.g., family visits, telephone calls, recreation, etc.), unless the inmate has lost those privileges as a result of a disciplinary sanction; and

- All inmates on suicide precautions shall not be locked down. They should be allowed dayroom access commensurate with their security level.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. Approve and implement the previously referenced draft suicide prevention policy.

   *d.*     *LCJ shall ensure inmates on Suicide Precautions receive regular, adequate mental status examinations by Qualified Mental Health Staff. Qualified Mental Health Staff shall assess and interact with (not just observe) inmates on Suicide Precautions on a daily basis.*

## OVERALL COMPLIANCE RATING:  NON-COMPLIANCE

## ASSESSMENT:

Currently, only two qualified mental health professionals (QMHP) are available. One is a masters-level, licensed clinician, the other, a part-time psychiatrist whose hours were recently raised to 16 hours per week. As such, there is insufficient staff available to conduct daily assessments.

Edgewater Systems (the mental health provider) has been authorized to hire 6 additional QMHPs (masters-level) who can be licensed outside the state of Indiana. In addition, 7 residential technicians have been hired and are currently working on the 4th floor. They are primarily responsible for observing inmates on suicide precautions.

Currently, there is inadequate documentation in the medical chart regarding "mental health examinations" of inmates on suicide precautions.  This provision is differentiated from Provisions C.2.e, C.3.a and C.3.b which requires a suicide risk assessment.  Here, only a daily mental health examination is required as a progress note. For purposes of documentation, the progress notes should be in SOAP format and provide a sufficient description of the current behavior (mental status exam) and justification for a particular level of observation.
The mental health manager is responsible to ensure that all current mental health staff begin utilizing SOAP-format to writing more robust progress notes.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. Approve and implement the previously referenced draft suicide prevention policy.
2. Refer to section re: mental health staffing.

> **e.** **LCJ shall ensure that inmates will only be removed from Suicide Precautions after approval by a Qualified Mental Health Professional, in consultation with a psychiatrist, after a suicide risk assessment indicates it is safe to do so. A Qualified Mental Health Professional shall write appropriate discharge orders, including treatment recommendations and required mental health follow-up.**

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

Currently, the masters-level QMHP is discharging inmates from suicide precautions in consultation with psychiatrist. Often, the consultation is via telephone which is permissible under this provision. When on-site (Tuesday and Wednesday), the psychiatrist often assesses inmates on suicide precautions.

Currently, treatment plans and follow-up assessments (within 7 days) for inmates released from suicide precautions are inadequate.  The *treatment plan*, which should be contained on the suicide risk assessment, is to describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur.  That is not happening.

*Follow-up assessments* should occur on a more frequent basis.  The following requirement is contained within the revised suicide prevention policy: unless an inmate's individual circumstances directs otherwise (e.g., an inmate inappropriately placed on suicide precautions by non-mental health staff and released less than 24 hours later following an assessment), the reassessment schedule following discharge from suicide precautions is: within 24 hours, then again within 72 hours, then again within 1 week, and then periodically until release from custody.

It appears from medical chart review that both medical and mental health staff routinely wrote "per Dr. Robbins" (the psychiatrist) even in incidences when he was <u>not</u> consulted. There should not be any standing physician orders in managing suicidal inmates. It is <u>not</u> necessary (or required by the Settlement Agreement) to receive doctor's orders to initiate a suicide precaution.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Approve and implement the previously referenced draft suicide prevention policy.
2. Remedy the "per Dr. Robbins" issue described above.
3. Following implementation of this policy, perform a relevant audit.

**3.** ***Suicide Risk Assessments.***

    **a.**    *LCJ shall ensure that any inmate showing signs and symptoms of suicide is assessed by a Qualified Mental Health Professional using an appropriate, formalized suicide risk assessment instrument within an appropriate time not to exceed 24 hours of the initiation of Suicide Precautions.*

## OVERALL COMPLIANCE RATING: PARTIAL COMPLIANCE

## ASSESSMENT:

Until recently, the QMHPs were not utilizing a formalized suicide risk assessment when assessing potentially suicidal inmates. Whether inmates are seen within 24 hours of initiation of suicide precautions by a QMHP is still contingent upon availability of the two QMHPs.

A Suicide Risk Assessment form has been developed and began implementation during the week of April 11, 2011. The form includes a brief mental status exam, listing of chronic and acute risk factors, listing of any protective factors, level of suicide risk (e.g., low, medium, or high), and treatment plan.

The Suicide Risk Assessment will be utilized during the initial assessment of risk that justifies an inmate's placement on suicide precautions, as well as when the QMHP determines that the inmate no longer is in need of suicide precautions.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

    1.  Approve and implement the previously referenced draft suicide prevention policy.

    **b.**    *LCJ shall ensure that the risk assessment shall include the following and findings from the risk assessment shall be documented on both the assessment form and in the inmate's medical record:*
    *(1)*    *description of the antecedent events and precipitating factors;*
    *(2)*    *suicidal indicators;*
    *(3)*    *mental status examination;*
    *(4)*    *previous psychiatric and suicide risk history;*
    *(5)*    *level of lethality;*
    *(6)*    *current medication and diagnosis; and*
    *(7)*    *recommendations or treatment plan.*

## OVERALL COMPLIANCE RATING: PARTIAL COMPLIANCE

## ASSESSMENT:

As stated in Provision, C.3.b, a suicide risk assessment form has been developed and recently implemented to include a brief mental status exam, listing of chronic and acute risk factors, listing of any protective factors, level of suicide risk (e.g., low, medium, or high), and treatment plan. The form includes the seven (7) required items above. The form template is being entered into CorrecTek.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Approve and implement the previously referenced draft suicide prevention policy.

**4.** **_Suicide Prevention Training._**

    **a.** **_LCJ shall review and, to the extent necessary, revise LCJ's suicide prevention training curriculum to include the following topics:_**

        **(1)** **_the suicide prevention policy as revised consistent with this Agreement;_**
        **(2)** **_why facility environments may contribute to suicidal behavior;_**
        **(3)** **_potential predisposing factors to suicide;_**
        **(4)** **_high risk suicide periods;_**
        **(5)** **_warning signs and symptoms of suicidal behavior;_**
        **(6)** **_observation techniques;_**
        **(7)** **_searches of inmates who are placed on Suicide Precautions;_**
        **(8)** **_case studies of recent suicides and serious suicide attempts;_**
        **(9)** **_mock demonstrations regarding the proper response to a suicide attempt; and_**
        **(10)** **_the proper use of emergency equipment, including suicide cut-down tools._**

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

The LCJ does not currently have a viable and on-going suicide prevention program. National correctional standards require that all correctional, medical, and mental health staff receive both pre-service and annual in-service training in suicide prevention.  Although the DOJSA does not specify a required length, the decision was made that all staff receive eight (8) hours of initial suicide prevention training, followed by two (2) hours of annual training.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Implement the revised suicide prevention policy and develop the suicide prevention curriculum.

    **b.** **_Within 12 months of the effective date of this Agreement, all LCJ staff members who work with inmates shall be trained on LCJ's suicide prevention program. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided._**

**OVERALL COMPLIANCE RATING:  NON- COMPLIANCE**

**ASSESSMENT:**

It is projected that the LCJ suicide prevention policy will be finalized and operational by June 2011.  At that time, the suicide prevention curriculum will be revised and training can then be scheduled to begin during the Summer of 2011.  All staff will need to be trained prior to December 2011.

If this schedule holds, an in-service lesson plan will be developed from the original curriculum and annual in-service training can commence in the Summer of 2012.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

> 1.  Implement the revised suicide prevention policy and develop the suicide prevention curriculum.

**D.  FIRE SAFETY:  Settlement Agreement Part III  Section D.**

*1.*     *Fire Safety.*

> *a.*     *LCJ shall develop and implement a comprehensive fire safety program and ensure compliance is appropriately documented. The initial fire safety plan shall be approved by the State Fire Marshal or the Crown Point Fire Chief or Inspector.  The fire safety plan shall be reviewed thereafter by the Marshal, Fire Chief or Inspector at least every two years, or within six months of any revisions to the plan, whichever is sooner.*

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

Based upon my review of fire safety related documents, staff interviews and personal observations, I found that there is not a comprehensive fire safety program in place.  There are some components of a comprehensive fire safety place, including  a process for testing the fire alarm and sprinkler system, a newly developed system for testing and inspecting fire and life safety equipment,  the beginnings of a credible emergency key control system, and posted fire evacuation signs throughout the facility.  However, I saw no evidence to suggest that the fire safety plan has been submitted or approved by the State Fire Marshal or Crown Point Fire Chief or Inspector.  During the tour I also observed in the new part of the Jail's housing units where inmates have been setting small fires on the metal shelving to warm food.  As a result of this, some inmate cells have smoke damage to the walls and ceilings.  In order for this type of violation to occur, the housing units must not be properly supervised by detention staff at all times.  I also noted that there is not a fire safety inspection program in place at this Jail.  Finally, I observed in several areas of the Jail and particularly in the old Jail area that rain water was seeping into light fixtures, which is a dangerous situation.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

> 1.  Lake County Jail officials and specifically the Facility Fire Safety Officer should

review all existing fire related policies and procedures and ensure that they contain all of the provisions of the SA.

2. The final facility fire safety plan should be submitted to the State Fire Marshal or Crown Point Fire Chief or Inspector for approval.

3. A qualified fire safety officer should develop and implement a fire safety inspection program for the jail.

4. The jail administration should take a critical view at the lack of staffing and inmate supervision within the inmate housing units and conduct a security staffing analysis.

**b.** ***LCJ shall ensure that comprehensive fire drills are conducted every three months on each shift. LCJ shall document these drills, including start and stop times and the number and location of inmates who were moved as part of the drills.***

## OVERALL COMPLIANCE RATING:  NON-COMPLIANCE

## ASSESSMENT:

Based upon my review of documents and interviews with staff and inmates, I found that the facility has not yet developed a fire drill program for the jail.  A barrier to developing such a program may very well be that there is not a full-time fire safety officer assigned who could develop and coordinate such an effort.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. The part-time fire safety officer should be assigned on a full-time status as the jail fire safety officer.  The jail is very large and it is unrealistic to assume that the fire safety program can be fully developed, implemented and sustained with only a part-time person.

**c.** ***LCJ shall ensure that LCJ has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas. Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures.***

## OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE

## ASSESSMENT:

All of the housing areas and other areas of the facility were equipped with fire and smoke alarm systems.  Maintenance and storage areas were equipped with fire sprinklers as well as food service areas.  During the inspection, facility staff were in the process of mounting AED's and SCBA's in strategic areas of the jail.  There were fire extinguishers available in all areas of the jail and had been recently checked and serviced.  It did not appear that the Laundry, although it is located in a separate building from the Jail, was equipped with fire sprinklers. During the inspection I also observed that the Maintenance Shop was cluttered with materials, tools,

unusable items, furniture and equipment.  I also observed a flammable storage metal container located within the Maintenance Shop that did not appear to be vented to outside of the building.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. SCBA's should be mounted in areas of the jail that are readily accessible to staff such as hallways or entrances to housing units.
2.  The local Fire Inspector should be contacted by Jail staff and verify whether or not sprinklers are required in the Laundry building.

**ADDITIONAL INSTRUCTIONS/DOCUMENTS FOR THE NEXT TOUR**:

1. I would like to see a letter from the local Fire Inspector regarding whether or not a sprinkler is required in the Laundry.  During the next tour, I will be inspecting the Maintenance Shop to see if the fire load has been addressed and the status of the flammable storage metal container.

> ***d.***       ***LCJ shall ensure that all fire and life safety equipment is properly maintained and routinely inspected.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

Jail staff have been working on identifying and ensuring that all fire and life safety equipment is properly maintained and routinely inspected.  A master inventory of fire and life safety equipment was in the process of being fully developed.  An initial inspection was conducted of this equipment.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. A routine inspection program should be implemented to ensure that all fire and life safety equipment is properly maintained and functional.
2. The fire and life safety inspection program should be under the direct supervision of the Jail fire safety officer.
3.  The inspection program should be clearly detailed in fire safety policies and procedures and become part of the facility comprehensive fire safety program.

> ***e.***       ***LCJ shall ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.***

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

Facility staff have started to work on developing a system for emergency key management. However, a master inventory of all emergency keys is not yet complete. Also, emergency keys have not yet been identified by touch. I also observed that some emergency key rings had multiple keys within the key ring. Emergency rings should contain a minimal number of keys in order to make it efficient and manageable. Jail staff have not been trained in the use of emergency keys.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Jail staff should continue to fully develop their emergency key system. When completed, the emergency key system should be described in the facility policy and procedure manual and staff should be trained on the policy and emergency key program.
2. A set of the final emergency keys should be kept in a location outside of the jail such as the dispatch center or other accessible area.

> *f.*     *LCJ shall ensure that staff are able to manually unlock all doors (without use of the manual override in the event of an emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible. LCJ shall conduct and document random audits to test staff proficiency in performing this task on all shifts, a minimum of three times per year. LCJ shall conduct regular security inspections and provide ongoing maintenance to security devices such as door locks, fire and smoke barrier doors, and manual unlocking mechanisms to ensure these devices function properly in the event of an emergency.*

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

During the inspection jail staff were generally knowledgeable on how the manual door unlocking system operates. Some staff were more knowledgeable that others. However, I did not see a system in place for conducting and documenting random audits for testing staff proficiency on the manual door unlocking system. I did not see evidence to demonstrate that a program of security inspections is in place for these devices. It appears that maintenance staff respond to problems with security devices such as door locks, fire and smoke barrier doors, and manual unlocking devices, but there does not seem to be a system or program in place for the regular checking and maintaining of these systems.

**RECOMMENDATION FOR THE NEXT 6 MONTHS:**

1. A policy and procedure should be developed and implemented that incorporates the provisions of this paragraph of the SA. The policy should specifically address an audit or inspection system for the security devices as well as the preventative maintenance program for the system.

2. LCJ officials should commence random audits for testing staff proficiency in performing manual unlocking of all doors with the use of manual override system. These audits should be documented.

3. Additional Instructions/Documents For Next Tour:  I would like to see documents that demonstrate the results of the inspections/audits that were conducted for the emergency unlocking system and staff response.

**g.    *LCJ shall implement competency-based testing for staff regarding fire and emergency procedures.***

## OVERALL COMPLIANCE RATING:  NON-COMPLIANCE

## ASSESSMENT:

I saw no evidence to suggest that LCJ has developed or implemented a competency-based testing for staff regarding fire and emergency procedures.  The topic of developing a staff training program has been discussed but not yet implemented.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. LCJ staff should develop and implement a competency-based testing for jail staff regarding fire and emergency procedures.  The testing protocols should be included in the Jail fire safety policy and procedure manual and become part of the overall comprehensive fire safety plan.

**h.    *LCJ shall ensure that fire safety officers are trained in fire safety and have knowledge in basic housekeeping, emergency preparedness, basic applicable codes, and use of fire extinguishers and other emergency equipment.***

## OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE

## ASSESSMENT:

During my visit the LCJ had assigned a staff member as the facility fire safety officer.  However, the duties of this individual had not been clearly articulated in writing.  Also, the assigned fire safety officer was only performing fire safety related duties on a part-time basis or as needed. The assigned fire safety officer appears to have an extensive background in fire safety matters to include training in emergency responses; incident management; firefighting; public works; hazardous materials; technical rescue awareness; rescue operations; CPR and 1st Aid; use of the AED; and attended fire school and fire college.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. The position of fire safety officer should become a full-time position within the jail. A facility the size of LCJ requires a full-time staff member to be able to successfully develop and implement a comprehensive fire safety program.  LCJ should develop

and implement a position description that describes the duties and responsibilities of the fire safety officer.  The fire safety officer's duties and responsibilities should be included in the fire safety policies and procedures.

2. The selected fire safety officer should receive training on basic housekeeping requirements and on the NFPA 101 Manual that describes fire safety matters in a correctional environment.

## E.  SANITATION AND ENVIRONMENTAL CONDITIONS.

*1.*    *Sanitation and Maintenance of Facilities.*

   *a.*    *LCJ shall revise and implement written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas. Such policies should include oversight and supervision, including meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

I did not see evidence of a written housekeeping and sanitation plan for the jail.  There are some facility policies and procedures that address select topics surrounding housekeeping and sanitation, but the overall program has not yet been developed or implemented.  There is not a meaningful housekeeping and sanitation inspection program in place for routine cleaning needs. I observed that staff and inmates had been working diligently to clean and sanitize the jail; however, a sustained program cannot be maintained without adequate staff oversight of the program or in the absence of written housekeeping and sanitation plans.  Inmates are not being properly supervised or instructed on acceptable housekeeping duties.  During the tour I observed many inmate cells that were unsanitary and neglected, cells in need of painting, cells walls with graffiti on them, smoke damaged cells, showers with mold and mildew build-up, return air vents clogged with debris and lint and food pass port flaps and doors with food build-up and food residue.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. LCJ should develop and implement meaningful written housekeeping and sanitation plans for the jail.  Incorporated in these plans should be an inspection program that clearly describes daily, weekly and monthly cleaning and inspection schedules. Cleaning schedules should describe specific staff and inmate duties and responsibilities for the cleaning and sanitation program.

2. The sanitation officers should provide oversight for the housekeeping and sanitation program. The overall plans can include specific policies and procedures that describe the housekeeping and sanitation program such as staff and inmate duties and responsibilities, a description of the inspection program, and material and supply allocation and control procedures.

> **b.**      ***LCJ shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, and sink units are adequately maintained and installed.***

## OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE

## ASSESSMENT:

The LCJ's physical plant had been neglected for several years.  The current administration has made obvious strides in refurbishing the physical plant and making needed repairs to the plumbing system.  Outside contractors have been hired to conduct plumbing repairs.  A work order process is in place and work orders can be tracked.  The LCJ still needs to develop and implement a preventative maintenance plan for responding to routine and emergency maintenance needs on an on-going basis.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. LCJ should continue to conduct needed repairs to the physical plant and plumbing system.
2. LCJ staff should develop a written preventative maintenance plan that includes, schedules for preventative maintenance inspections and repairs, staff assignments that are responsible for inspection and repairs, a description of the work order system and an inventory of regularly needed spare parts and plumbing fixtures.
3.  The above requirements should be addressed in a facility policy and procedure.

> **c.**      ***LCJ shall ensure adequate ventilation throughout LCJ to ensure that inmates receive an adequate supply of airflow and reasonable levels of heating and cooling. LCJ shall review and assess compliance with this requirement at least twice annually.***

## OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE

## ASSESSMENT:

During the inspection I observed that many inmate cells had had the air vents covered with materials thus obstructing air flow.  I also observed that in many of the housing unit dayroom areas the return air flow vents were saturated with lint and debris.  It is difficult to be able to achieve and maintain a balanced supply of airflow under these conditions.  LCJ staff reported that an outside contractor had assessed the ventilation system and all areas had been balanced.  I did not review the report of that assessment, but it does not appear that the return air vents in the dayroom areas were addressed because the debris in them is substantial and longstanding.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. Staff should intensify their efforts to ensure that cell vents are not covered by inmates.   This can be partly accomplished by conducting daily cell sanitation

   inspections.

2. Maintenance staff should keep records of temperature readings of the housing units and other areas of the jail.

3. The return air vents in the housing unit dayrooms should be regularly cleaned and made free of debris.

**ADDITIONAL INSTRUCTIONS/DOCUMENTS FOR THE NEXT TOUR:**

During the next tour I will expect to see documents from the outside contractor on the results of their inspections and balancing records for the ventilation system.  I will also be reviewing temperature logs that record maintenance staff temperature readings for the various areas of the Jail.

   ***d.  LCJ shall ensure adequate lighting in all inmate housing and work areas and cover all light switches with exposed wires.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

During the inspection I did not detect a wholesale problem with the lighting system.  LCJ staff have been working diligently on making repairs to the lighting system and replacing light bulbs and fixtures.  I did not detect any exposed wiring during my inspection.  There were some cells and dayrooms that had lights burned out or in need of repair.  I only detected one electrical outlet in a janitor's closet in the medical area that did not have a cover.  In some areas of the jail I did detect that rain water had seeped into light fixtures which is a serious life safety hazard.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. LCJ staff should include the lighting and electrical system as part of their daily housekeeping inspection program and preventative maintenance program.

2. LCJ staff should make prompt repairs to the roofing to ensure that rain water does not seep down into the lighting system.

   ***e.  LCJ shall ensure adequate pest control throughout the housing units, medical units, and food storage areas.***

**OVERALL COMPLIANCE RATING:  SUBSTANTIAL COMPLIANCE**

**ASSESSMENT:**

During the inspection of inmate housing units, program areas, the food service department, the medical area and general areas of the Jail, I did not detect a problem with pest control.  The LCJ reportedly has a contract with a pest control company for these services.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1.   LCJ should continue with their pest control program.

*f.*      ***LCJ shall ensure that all inmates have access to needed hygiene supplies.***

## OVERALL COMPLIANCE RATING:  SUBSTANTIAL COMPLIANCE

## ASSESSMENT:

During the inspection I did not observe a problem in this area.  Inmates had in their possession needed hygiene supplies.  There was a significant amount of hygiene supplies in storage areas.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1.   Continue to issue inmate hygiene supplies at intake to inmates and as needed.
2.   Include in the revised Inmate Handbook hygiene issue quantities and frequency of issue.

*g.*      ***LCJ shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials. LCJ shall ensure that any inmate or staff utilized to clean a biohazardous area are properly trained in universal precautions, are outfitted with protective materials, and receive proper supervision when cleaning a biohazardous area.***

## OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE

## ASSESSMENT:

There does not appear to be a comprehensive coherent policy and procedure that addresses this area of operation.  There seems to be several policies that in part address this area.  I observed during the inspection that some areas of the facility did not have spill kits available such as in the medical area and in the medical control booth.  I also observed in the medical area that none of the biohazard containers had lids on them even though they contained biohazard materials.  Staff reported that staff and inmates have been trained by supply companies on biohazard spills.  LCJ should have their own policy, procedure and staff and inmate training program for this area of operation, including the specific areas of the jail where spill kits and biohazard supplies are kept.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1.   LCJ should have their own policy, procedure and staff and inmate training program for this area of operation, including the specific areas of the jail where spill kits and biohazard supplies are kept.

*h.*      ***LCJ shall provide and ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

## OVERALL COMPLIANCE RATING:  SUBSTANTIAL COMPLIANCE

**ASSESSMENT:**

The facility uses universal cleaning chemicals for cleaning biohazard spills as well as a bleach solution. I did not get an opportunity to view an actual biohazard spill cleanup while on-site.

**RECOMMENDATIONS FOR THE NEXT VISIT:**

1. LCJ supervisory staff should ensure that staff and inmates that clean biohazard spills follow the recommended instructions of the chemicals used for the cleanup.

   *i.* *LCJ shall inspect and replace as often as needed all frayed and cracked mattresses. LCJ shall destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. LCJ shall ensure that mattresses are properly sanitized between uses.*

**OVERALL COMPLIANCE RATING: PARTIAL COMPLIANCE**

**ASSESSMENT:**

During the inspection I did not detect any frayed or cracked mattress. There were ample supplies of inmate mattresses in storage for replenishment purposes. Inmates are assigned to clean mattresses between uses. However, I noted that the mattresses are not being properly sanitized in accordance with the sanitizing chemical instructions. Inmates who clean the mattresses as well as staff description of the process are not allowing the sprayed chemical to air dry, rather they are wiping it off almost immediately upon spraying thus not allowing the chemical to take proper effect and sanitization.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Train staff and inmates that are responsible for sanitizing mattresses on the proper use of the sanitizing chemicals. Supervisory staff should inspect and review the mattresses sanitization process and ensure it is done correctly.

   *j.* *LCJ shall ensure adequate numbers of staff to perform housekeeping duties.*

**OVERALL COMPLIANCE RATING: PARTIAL COMPLIANCE**

**ASSESSMENT:**

LCJ has two sanitation officers. These officers provide cleaning materials to inmates and to some extent they also supervise trustee workers. However, inmate workers within the housing units receive little, if any, instruction and supervision for their cleaning duties. I found sanitation in the housing units to be poor, with some exceptions. The bigger problem seems to be the general lack of supervision of inmates in the housing units. For example, I observed one floor officer trying to provide supervision to inmates in eight pods or two housing units in the new part of the jail. In the old part of the jail, I observed one officer trying to provide supervision of

inmates in three to six living units (pods). It is unrealistic to expect that one officer can perform all the duties required of a floor officer and be able to perform them in a qualitative manner. This inadequacy is highlighted by lack of inmate supervision whereby inmates are able to draw graffiti on their cell walls without being detected or by making small fires in the metal shelving to warm food, as well as general unsanitary conditions. I also observed that officers do not normally enter the actual inmate living areas, but rather patrol the outside of the dayrooms and the catwalks. If inmates are out of their cells, the officer does not go into the actual living area. I reviewed the Estimated Functional Jail Be Capacity Report 2010 authored by RJS and noted that the correctional officer force complement was inadequate. The report reflected a shortage of approximately 68 correctional officers. I noted a similar inadequacy as I toured the housing units as described above. There are simply an inadequate number of correctional officers deployed into the housing units to properly supervise inmates and in particular, for supervising inmates that are performing housekeeping duties.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1.  LCJ officials should closely examine their correctional officer staff and move towards providing direct inmate supervision in the inmate housing units in order to better supervise inmates and the housekeeping and sanitation program.

**ADDITIONAL INSTRUCTIONS/DOCUMENTS FOR THE NEXT TOUR:**

It is expected that LCJ officials will have commenced a process for providing adequate inmate supervision in the housing units.[1] It is expected that a copy of the final "comprehensive jail staffing analysis" will be made available to DOJ staff and me for review.

**2.    *Sanitary Laundry Procedures.***

   a.    ***LCJ shall develop and implement policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease.***

**OVERALL COMPLIANCE RATING: PARTIAL COMPLIANCE**

**ASSESSMENT:**

It appears that the laundry operation is addressed in several LCJ policies and procedures within Chapter 15 of the LCJ Policy and Procedure Manual. Policy 15-1504 appears to be the main policy governing the laundry operation. In the procedural guidelines section of this policy, it addresses "Contaminated and Infested Clothing". This section of the policy does not address the specific procedures for handling and washing contaminated and infested clothing, instead a reference is made to "handle in accord with procedures developed". Those procedures were not made available to me for review. However, the specific procedures for handling and washing contaminates should be addressed in the laundry policy and procedure manual. Also, the process

---

[1] Kenneth A. Ray with Justice Services, LLC indicated by letter dated April 1, 2011 to Sheriff Bunich and the DOJ team that a "comprehensive jail staffing analysis has been authorized…" to commence in May 2011 and to be completed in July 2011.

for the cleaning and sanitizing of the laundry carts should also be specified in the laundry policy and procedure. I toured the laundry and found it to be very effective and well equipped. The laundry is equipped with modern washers and dryers and with a new water heating system. The washers are equipped with automatic injections of detergent and sanitizing solutions. Washing and drying times are specified in the equipment and are also automated.[2]

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. LCJ should develop a comprehensive policy and procedure that governs the total laundry operation. The policy and procedure should include the specific procedures on the washing and handling contaminated clothing and bedding. The revised laundry policy and procedure should also include the procedures for cleaning and sanitizing the laundry carts between uses.

b. *LCJ shall ensure that inmates are provided adequate clean clothing, underclothing and bedding, consistent with generally accepted correctional standards (e.g., at least twice per week), and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas.*

**OVERALL COMPLIANCE RATING: PARTIAL COMPLIANCE**

**ASSESSMENT:**

Based upon my observations, review of documents and staff and inmate interviews, I do not believe that inmates are being provided with adequate quantities of clean clothing, underclothing and bedding. For example, laundry exchange only occurs once per week instead of the required two exchanges per week. Inmates are only provided with one uniform, one sheet, one towel, one blanket, one mattress and a laundry bag. During the tour I observed inmates washing their clothing in the sinks, showers or toilets, which is highly unsanitary. Inmates also complained that their blankets are seldom washed. I was also informed by facility staff that the indigent provisions only kick in after the inmate has been at the facility for at least 30 days. This policy can also present a hygiene problem in that inmates may not have personal underwear or in the case of female inmates, bras. However, the facility does not provide any underwear to inmates regardless of whether they are indigent or not.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. It is my recommendation that the inmate initial issue for bedding and hygiene consist of: one mattress; two bed sheets; two towels; and one blanket. The sheets and towels should be exchanged at least once per week, unless inmates are only issued one sheet and one towel, then they should be exchanged twice per week.[3] Blankets should be

---

[2] Although not directly a provision of the SA, I observed that the laundry van does not have a Tommy or hydraulic lift to help load and unload laundry carts. Currently, a metal ramp is used for this purpose which is risky for the officer that handles these duties due to the heaviness of the laundry carts.

[3] LCJ officials recommended that inmates be issued one towel and one wash cloth and washed two times per week. This would be an acceptable practice and would be consistent with accepted correctional standards.

exchanged at least on a monthly basis and mattress should be sanitized on a regular basis and between inmate uses.

*c.*        *LCJ shall train staff and educate inmates regarding laundry sanitation policies.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

It appears that a private vendor has been providing training to laundry staff.  Security staff were provided training on the provisions of the SA as it relates to laundry issues.  It does not appear that a system has been developed to educate inmates regarding laundry sanitation policies.  Staff reported that the Inmate Handbook could be used as one avenue for educating inmates on laundry sanitation policies.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. LCJ staff should include the provisions of the SA in their basic and on-going staff training program so that security and laundry staff are fully aware as to their obligations regarding the facility sanitation policies.
2.  The inmate Handbook should be revised and include the expectations of inmates regarding laundry sanitation policies.

*d.*        *LCJ shall ensure that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

LCJ staff have developed practices that to some extent, protects inmates from exposure to communicable diseases.  For example, the laundry carts are cleaned and sanitized between uses; however, staff and inmates are not following the manufactures recommended instructions for the proper use of sanitizing chemicals.  As reported earlier in this report, staff and inmates are not allowing sanitizing chemicals to air dry after application.  Instead, the sanitizing chemicals are being wiped off from the surfaces prematurely and not allowing them to take the proper effect.  I did not detect that clean laundry was coming into contact with dirty laundry or contaminated surfaces.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. LCJ staff should provide instructions to staff and inmates on the proper use of sanitizing chemicals.

e. *LCJ shall require inmates to provide all clothing and linens for LCJ laundering and*

*prohibit inmates from washing and drying laundry outside the formal procedures.*

## OVERALL COMPLIANCE RATING:  NON- COMPLIANCE

## ASSESSMENT:

I did not see a provision in the Inmate Handbook prohibiting inmates from washing and drying laundry outside the formal procedures.  During the tour I observed some inmates washing undergarments, clothing and towels in the sinks, showers or toilets.  This problem is complex.  For example, inmates are not issued undergarments so they may only have the pair, if any, with which  they came into the jail.  Particularly with the female inmates, undergarments are critical to their personal hygiene and some female inmates may only have one pair of undergarments.  For those inmates that do have undergarments, they are only washed once per week.  Inmates that are indigent do not get underwear as part of any institutional issue.  Therefore, inmates resort to washing their clothing, undergarments and towels outside the formal procedures.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. The Inmate Handbook should contain a provision prohibiting inmates from washing and drying laundry outside the formal procedures.
2. Inmates should also be issued sufficient quantities of clothing and towels to provide for proper hygiene and laundered as previously recommended in this report.
3. LCJ should also consider providing newly admitted indigent inmates with a reasonable number of undergarments to provide for proper hygiene.

*3.*     *Food Service.*

   a.     *LCJ shall ensure that food service at LCJ is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures, and adequate meals are provided.*

## OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE

## ASSESSMENT:

From my observations and interviews with staff and inmates, I found that adequate meals are being provided.  Meals are prepared in a safe and hygienic manner.  However, I did note a problem regarding food temperatures.  It does not appear that food temperatures are taken of serving times.  I also observed that once food is placed in the insulated food trays and loaded onto the food carts, they are not delivered to the inmate housing units in a prompt manner, thus losing proper temperatures at serving time.  Food temperature readings that I took of food that was already placed in thermo trays and on food carts awaiting to be taken to the housing units were at unacceptable food temperature ranges.  For example, the hot foods ranged between 118 and 123 degrees Fahrenheit.  The cold food temperature was at approximately 65 degrees Fahrenheit.  The proper food temperatures for the hot food should have been approximately 135-140 degrees Fahrenheit and the cold foods at approximately at 41 degrees Fahrenheit.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Supervisory staff should monitor food service operations and ensure that food service staff are obtaining and recording food temperatures during placement of food into the thermo trays and at serving times.
2. Supervisory staff should ensure that food temperatures are proper and safe for serving.

   ***b.   LCJ shall ensure that all food service staff, including inmate staff, must be trained in food service operations, safe food handling procedures, and appropriate sanitation.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

Food service staff described the food service training program verbally to me.  However, it does not appear that there are training records for all food service staff.  Staff training for food service staff is informal.  It is difficult to determine whether or not all food service staff are being trained on the specific provisions of this paragraph of the SA in the absence of staff training records and training lesson plans and staff sign-in sheets.  On a practical level, food service staff appear to be knowledgeable of food service operations.  During the tour, I also observed that there is not adequate control and accountability for chemicals such as lime scale remover, detergents, pot and pan soap, bleach, degreaser and spray oven cleaner.  There were also no Material Safety Data Sheets available for these chemicals.  The control of caustic, toxic and hazardous materials should be part of the food service training program for food service personnel and assigned inmates.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. LCJ should develop and maintain training records for food service staff and at a minimum, address the training topics required by this paragraph of the SA.  All food service training provided should be well documented.
2. Food service personnel should establish policies, procedures and practices regarding the control of caustic, toxic and hazardous material used in the kitchen.  Material Safety Data Sheets should be made readily available in the kitchen.

   ***c.   LCJ shall ensure that kitchen(s) are staffed with a sufficient number of appropriately supervised and trained personnel.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

There are eleven food service personnel, including the food service supervisor assigned to the kitchen.  The food service operation is supplemented with inmate workers.  Extensive work has

been done to repair and/or replace food service equipment.  The number of food service personnel assigned to operate the kitchen appears to be adequate.[4]  However, there are no individual training records maintained of staff training and re-training.[5]

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

    1.  LCJ staff should develop and maintain individualized training records for all food service personnel.  The training records should document both on-site and off-site training and any past training that was provided to kitchen personnel on food service matters.

    *d.  LCJ shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

During the tour, I found dishes and utensils, food preparation and storage areas to be clean and sanitary.  However, I also noted that the food service delivery carts and food tray storage carts were not appropriately cleaned and sanitized.  For example, I noted build-up of food particles on these two types of carts.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

    1.  It is recommended that the cleaning and sanitizing of food service delivery carts and food tray storage carts be incorporated into the daily, weekly and monthly sanitation inspection program.

    *e.  LCJ shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

---

[4] It appears that the comprehensive jail staffing analysis that was scheduled in May 2011 will also include food service staffing.

[5] Although not directly addressed in a provision of the SA, I observed in the dry storage area of the kitchen that the camera does not capture all areas, such as the desk area where an inmate worker is assigned and other areas within the dry storage.  Staff reported that there could be occasions where an inmate worker is left unattended or unsupervised for a short period of time.  This is an unacceptable security and safety practice.

According to LCJ food service personnel and based on my observations during the tour, I noted that food service personnel started recording walk-in refrigerator and freezer temperatures in January of 2011.  Dishwasher temperatures are taken every 2-3 days.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. It is my recommendation that temperatures of all refrigerators, coolers, walk-in refrigerators and the dishwasher water be checked and recorded on a daily basis.  This will allow food service staff to detect a temperature problem promptly so it can be corrected.

**F.  QUALITY IMPROVEMENT PROGRAM:  Settlement Agreement Part III Section F.**

1. *LCJ shall develop and implement written quality management policies and procedures to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreement, as applicable.*

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

LCJ currently has a QA committee but is nonfunctional. There are no existing QA policies or procedure. The current healthcare provider QA policies are nonfunctional.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Develop and implement policies and procedures relevant to quality improvement/quality management.

2. *LCJ shall develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution.*

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

Previously used and existing policies and procedures are under review.  Metrics and compliance goals have not yet been developed.  Methods and process for ensuring sustained compliance need to be established and implemented.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Review existing program documents, update, amend, etc. The QA program should be global to cover all Settlement Agreement provisions; clarify conditions and circumstances contributing to inconsistent program management.

2. Develop relevant policies and procedures and begin implementation.

***3.   LCJ shall institute a Quality Improvement Committee and ensure that such committee meets on a monthly basis and that this committee includes representatives from medical, mental health, and custody staff.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

A team has been put in place and meetings are scheduled for the 2nd and 4th Thursday of each month.  Until otherwise determined, the QA workgroup shall serve as the QIC.  A healthcare QIC subcommittee has been established to improve process and resource efficiency. The QIC Healthcare sub-committee reports to and collaborates with the QIC.

**RECOMMENDATIONS FOR NEXT 6 MONTHS:**

1. Review existing program documents, update, amend, etc. The QA program should be global to cover all Settlement Agreement provisions; clarify conditions and circumstances contributing to inconsistent program management.
2. Develop relevant policies and procedures and begin implementation.
3. The QIC should meet twice monthly.
4. Department heads should review the QA program make committee member appointments for their respective departments. All Settlement Agreement Compliance Inspectors should be members of the QIC.

***4.   Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time and specifically shall address:***

***a.   the effectiveness of the intake assessment, referral, and sick call process;***
***b.   the management and utilization of psychotropic medications;***
***c.   suicide prevention, including assessment of suicide risk, review and tracking of suicide attempts, monitoring of inmates on suicide observations or precautions;***
***d.   the appropriateness of physical plant facilities such as safe cells for management of at risk inmates, and follow-up and treatment for those who may have engaged in suicidal or self-harm activities;***
***e.   the appropriateness of treatment planning and treatment interventions for inmates in the mental health program;***
***f.   discharge planning for the effective management and continuity of care for inmates leaving the system; and***
***g.   the quality of medical records and other documentation.***

**OVERALL COMPLIANCE RATING:  NON-COMPLIANCE**

**ASSESSMENT:**

Oversight and the QIC should implement this provision and review proposed metrics for core measures.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. Review existing program documents, update, amend, etc. The QA program should be global to cover all Settlement Agreement provisions; clarify conditions and circumstances contributing to inconsistent program management.
2. Develop relevant policies and procedures and begin implementation.

**G. PROTECTION FROM HARM:  Settlement Agreement Part III Section G.**

*5.* *Use of Force by Staff.*

*a.* *LCJ shall develop and maintain comprehensive and contemporary policies and procedures surrounding the use of force and with particular emphasis regarding permissible and impermissible use of force.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

Prior to the tour, I was provided with a copy of LCJ's Use of Force Policy and Procedure, contained in Chapter # 8-808.  The date of the last revision for this policy and procedure is recorded as September 1, 2010.  This version of the Use of Force policy and procedure is inadequate and does not address the substantive requirements of the SA.  However, during the tour I was provided with a copy of an undated draft Use of Force policy and procedure by Mr. Brad Hompe, Consultant with RJS Justice Services.  Overall, this version of the LCJ Use of Force Policy and Procedure is comprehensive and addresses the substantive areas of the SA. This policy contains and emphasis permissible and impermissible use of force.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. The draft policy concerning the Use of Force that was provided to me by Mr. Brad Hompe should be finalized and implemented as well as providing training to all LCJ staff on it.[6]

*b.* *LCJ shall address the following impermissible uses of force in its use of force policy and in the pre-service and in-service training programs for correctional officers and supervisors:*

---

[6] Any reference I make to the Use of Force Policy and Procedure in this section of the report refers to the draft version of the policy and procedure that was provided to me by Mr. Brad Hompe (the draft use of force policy and procedure).

    *(1)*      *use of force as an initial response to verbal insults or inmate threats;*

    *(2)*      *use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless LCJ has attempted a hierarchy of nonphysical alternatives that are documented;*

    *(3)*      *use of force as punishment or retaliation;*

    *(4)*      *striking, hitting, or punching a restrained inmate;*

    *(5)*      *use of force against an inmate after the inmate has ceased to offer resistance and is under control;*

    *(6)*      *use of choke holds on an inmate; and*

    *(7)*      *use of unnecessary or excessive force.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

The draft Use of Force Policy and Procedure contains the provisions of paragraph b. and sub-paragraphs 1-7 of the SA.  The only departure I noted and discussed with Mr. Brad Hompe during the tour was concerning sub-paragraph b.4. - striking, hitting, or punching a restrained inmate; The term "unnecessarily" has been added to this sub-paragraph.  The rationalization given to me by Mr. Hompe for making the recommended addition to the LCJ's Use of Force Policy and Procedure was that there could be extreme circumstances in a use of force incident that could necessitate the need to hit, strike or punch a restrained inmate.  For example, if an inmate is actively attacking a staff member or other inmate, with or without a weapon, or in instances where the officer is trying to defend himself/herself from the attack, they may need to use the necessary force to control the situation.  On a practical level I agree with Mr. Hompe.  However, I believe that if an officer uses impermissible force outside the bounds of the use of force policy, he or she would have to justify the reason this type of force was employed.  The reviewing supervisors or investigators would have to make a determination whether it was reasonable to take into consideration the totality of the circumstances.  This type of extreme example can also be addressed in the staff training program on the use of force without having to alter the language of the LCJ Use of Force Policy and Procedure.

The Use of Force pre-service and in-service training program on the draft Use of Force Policy and Procedure has not yet being developed.  The first step is to finalize the use of force policy and then commence with the implementation stage, which also includes the training for correctional officers and supervisors.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. LCJ officials should sign and finalize the draft Use of Force Policy and Procedure and incorporate it into the pre-service and in-service training program for correctional officers and supervisors. Staff should start receiving training on the final Use of Force Policy and Procedure.

c. *LCJ shall develop and implement a policy to ensure that staff adequately and promptly report all uses of force.*

## OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE

## ASSESSMENT:

In my review of the draft Use of Force Policy and Procedure, I noted that is contains this provision of the SA. However, the draft Use of Force Policy and Procedure has not yet been implemented.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. LCJ officials sign and finalize the draft Use of Force Policy and Procedure and commence its implementation.

d. *LCJ shall ensure that use of force reports will:*

(1) *be written in specific terms in order to capture the details of the incident;*

(2) *contain an accurate account of the events leading to the use of force incident;*

(3) *include a description of the weapon or instrument(s) of restraint, if any, and the manner in which it was used;*

(4) *be accompanied with the inmate disciplinary report that prompted the use of force incident, if applicable;*

(5) *state the nature and extent of injuries sustained both by the inmate and staff member;*

(6) *contain the date and time medical attention was actually provided;*

(7) *describe, in factual terms, the type and amount of force used and precise actions taken in a particular incident and avoid use of "boiler plate" descriptions for describing force, such as, "inmate taken to the ground with the force that was necessary;" and*

(8) *note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide*

*an explanation as to why it was not videotaped.*

## OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE

## ASSESSMENT:

The revised draft Use of Force Policy and Procedure contains the elements of this provision of the SA including sub-paragraphs d. 1-8.  However, the draft Use of Force Policy and Procedure has not been approved, signed an implemented.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1.   The draft Use of Force Policy and Procedure should be finalized, signed and implementation commenced.
2.   I would also recommend that a new use of force be developed and implemented that includes all the elements of this provisions of the SA.

*e.*   *LCJ shall require prompt administrative review of use of force reports.  Such reviews shall include case-by-case review of individual incidents of use of force as well as more systemic review in order to identify patterns of incidents.  LCJ shall incorporate such information into quality management practices and take necessary corrective action.*

## OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE

## ASSESSMENT:

The draft Use of Force Policy and Procedure contains the provisions of this paragraph of the SA. However, the draft policy and procedure has not been implemented; therefore it cannot be evaluated in totality as of yet.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1.   The draft Use of Force Policy and Procedure should be approved and signed and implemented.  Security staff and supervisors should start receiving training in on the Use of Force Policy and Procedure.
2.   It is also my recommendation that all use of force incidents be reviewed by the Deputy Warden of Security and the Warden.

*f.*   *LCJ shall ensure that Qualified Medical Staff request that inmates sign arelease of medical records for the limited purpose of administrative and investigative review of any incident involving an inmate injury.  Qualified Medical Staff will document the request and the inmate's response.  LCJ will ensure that inmates receive adequate medical care regardless of whether they consent to release their medical records.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

This provision of the SA is addressed in the draft Use of Force Policy and Procedure.  However, the consultants are still working on a coordinated effort between security and medical services to ensure it is clearly understood and that these provisions are also addressed in medical policy and procedure.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

    1.      It is recommended that the medical policies and procedures will also include these provisions of the SA and that both security and medical staff start receiving training on them.

    **g.**      ***LCJ shall ensure that management review of use of force reports and inmate grievances alleging excessive or inappropriate uses of force includes a timely review of medical documentation of inmate injuries as reported by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

These provisions of this paragraph of the SA are addressed in the draft Use of Force Policies and Procedures.  RJS consulting staff are working with the medical staff in ensuring that the medical policies and procedures address these provisions of the SA as well.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

    1.      Staff should sign, approve and implement the draft Use of Force Policy and Procedure.
    2.      The medical policies and procedures should also contain the provisions of this paragraph of the SA.

    **h.**      ***LCJ shall establish criteria that trigger referral for use of force investigations, including but not limited to, injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, broken teeth, injuries to the genitals, etc.); injuries that require treatment at outside hospitals; and reports of events by staff and inmates that are inconsistent.***

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

The draft Use of Force Policies and Procedures contain the provisions of this paragraph of the SA.[7]  It appears that some staff training has already been conducted regarding this provision paragraph of the SA.  However, all staff need to be trained on it as part of the pre-service and annual in-service staff training program.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

    1.      The draft Use of Force Policy and Procedure should be approved, signed and implemented.

    *i.*      *LCJ shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information:*

        *(1)    a tracking number;*
        *(2)    the inmate(s) name;*
        *(3)    housing assignment;*
        *(4)    date;*
        *(5)    type of incident;*
        *(6)    injuries (if applicable);*
        *(7)    if medical care is provided;*
        *(8)    primary and secondary staff involved;*
        *(9)    reviewing supervisor;*
        *(10)   external reviews and results (if applicable);*
        *(11)   remedy taken (if appropriate); and*
        *(12)   administrative sign-off.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

These provisions of this paragraph of the SA have been incorporated into the draft Use of Force Policy and Procedure.  The draft Use of Force Policy and Procedure has not yet been approved, signed or implemented.   The system to track all incidents of use of force has not been implemented.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

    1.      The draft Use of Force Policy and Procedure should be approved, signed an implemented including the use of force tracking system.

    *j.*      *LCJ shall ensure that as part of a use of force incident package, security supervisors shall ensure that photographs are taken of any and all reported*

---

[7] It appears that there is a typographical error on page 11, paragraph c. of the draft policy regarding the term "suspicious".  The word "suspicious" is misspelled.

*injuries sustained by inmates and staff promptly following a use of force incident. The photographs will become evidence and be made part of the use of force package and if, applicable, used for investigatory purposes.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

These provisions of this paragraph of the SA are contained in the draft Use of Force Policy and Procedure.  However, the draft Use of Force Policy and Procedure has not been approved, signed or implemented.  There has been some training provided on these provisions to LCJ staff.  It is too early to evaluate the provisions of this paragraph in the absence of the policy implementation and full staff training.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1.     The draft Use of Force Policy should be approved, signed and implemented in order to fully evaluate compliance with the SA.

*k.     LCJ shall establish an "early warning system" that will document and track correctional officers who regularly employ force on inmates and any complaints related to the excessive use of force, in order to alert LCJ administration to any potential need for retraining, problematic policies, or supervision lapses. Appropriate LCJ leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT**:  An early warning system is addressed in the draft Use of Force Policies and Procedures.  However, the policy has not yet been approved, signed and implemented.  It is too early to evaluate the overall requirements of these provisions of this paragraph of the SA because the overall system is not yet developed and implemented.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1.     The draft Use of Force Policy and Procedure should be approved, signed and implemented.
2.     Concomitant with the implementation of the Use of Force Policy and Procedure, LCJ staff should start developing and implementing the early warning system described in the draft Use of Force Policy and Procedure.

*l.     LCJ shall ensure that a supervisor is present during all planned uses of force.*

**OVERALL COMPLIANCE RATING: PARTIAL COMPLIANCE**

**ASSESSMENT:**

This provision is addressed in the draft Use of Force Policy and Procedure, but it is not explicit. The language in the draft Use of Force policy and Procedure suggests that a supervisor will be present during planned uses of force.  The draft Use of Force Policy and Procedure has not been approved, signed or implemented.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. The draft Use of Force Policy and Procedure should be approved, signed and implemented.  The draft policy should contain the explicit language of this provision of the SA.

**m.** *Where there is evidence of staff misconduct related to inappropriate or unnecessary force against inmates, LCJ shall initiate appropriate personnel actions and systemic remedies, as appropriate.  LCJ shall discipline appropriately any correctional officer found to have:*

*(1)* *engaged in use of unnecessary or excessive force;*
*(2)* *failed to report or report accurately the use of force;*
*(3)* *retaliated against an inmate or other staff member for reporting the use of excessive force; or*
*(4)* *interfered or failed to cooperate with an internal investigation regarding use of force.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

The draft Use of Force Policy and Procedure contains the provisions of this paragraph of the SA. However, the draft Use of Force Policies and Procedures have not been approved, signed or implemented.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. It is recommended that the draft Use of Force Policy and Procedure be approved, signed and implemented so that full compliance can be evaluated with respect to discipline of staff that have used inappropriate or unnecessary force against inmates.

**n.** *LCJ shall develop and implement accountability policies and procedures for the effective and accurate maintenance, inventory and assignment of chemical and other security equipment.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

The draft Use of Force Policy and Procedures address incapacitating agents, electronic control devices and the use of the restraint chair. It appears that the procedure for the maintenance, inventory and assignment for the electronic control device is addressed in the use of policy. However, the policy does not contain those controls for restraint equipment such as handcuffs and leg irons. However, LCJ may have other policies and procedures governing all security equipment, but it should be cross-reference with the Use of Force Policy and Procedure and contain the specific provisions of this paragraph of the SA. Also, the explicit procedures for the accurate maintenance, inventory and assignment of chemical agents is not addressed in the Use of Force Policy and Procedure. There also does not appear to be inventory and maintenance logs for the security equipment.[8]

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1. The draft Use of Force Policy and Procedures should be approved, signed and implemented.
2. The use of force policy should also either include the provisions required by this paragraph of the SA or address them in a standalone document, but ensure they are cross-referenced.

> ### o.   *Use of Force Training:*
>
> (1)   *LCJ shall develop an effective and comprehensive training program in the appropriate use of force.*
>
> (2)   *LCJ shall ensure that correctional officers receive adequate training in LCJ's use of force policies and procedures.*
>
> (3)   *LCJ shall ensure that correctional officers receive adequate training in use of force and defensive tactics.*
>
> (4)   *LCJ shall ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports.*

## OVERALL COMPLIANCE RATING:  NON-COMPLIANCE

## ASSESSMENT:

The staff training provisions for the requirements of this paragraph of the SA were not available. It does not appear that the overall staff training program concerning the use of force has been developed in a comprehensive manner that would address these provisions of the SA.

---

[8] The use of the restraint chair is also addressed in the draft Use of Force Policy and Procedure. The policy governing the use of the restraint chair should be fully developed in consultation with medical and mental healthcare staff. For example, I noted that it allows an inmate to be placed in the restrain chair initially for no longer than 12 hours, but that time can be extended. The use of the restraint chair should not be used longer than is necessary and should provide for a lesser time period if the circumstances dictate.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1.LCJ should develop a staff training program for the use of force that addresses the provisions of this paragraph of the SA.

*p.* *LCJ shall ensure that inmates may report allegations of the use of excessive force orally to any LCJ staff member, who shall reduce such reports to writing.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

The draft Use of Force Policies and Procedures contain the provisions of this paragraph of the SA.  However, the draft Use of Force Policies and Procedures have not been approved, signed or implemented.

**RECOMMENDATIONS FOR THE NEXT 6 MONTHS:**

1. The draft Use of Force Policies and Procedures should be approved, signed and implemented.

*q.* *LCJ shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury.  If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate abuse, that health care provider shall immediately:*

*(1)* *take all appropriate steps to preserve evidence of the injury (e.g., photograph the injury and any other physical evidence);*

*(2)* *report the suspected abuse to the appropriate LCJ administrator;*
*(3)* *adequately document the matter in the inmate's medical record; and*

*(4)* *complete an incident report.*

**OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE**

**ASSESSMENT:**

These provisions of this paragraph of the SA are addressed in the draft Use of Force Policy and Procedure.  However, the draft Use of Force Policy and Procedures has not been approved, signed or implemented.

**RECOMENDATIONS FOR THE NEXT 6 MONTHS:**

1.   The draft Use of Force Policies and Procedures should be approved, signed and implemented.

2.   These provisions should also be addressed in the medical policies and procedures.

**r.   *LCJ shall develop, assign, and train a team of specialized use of force investigators that will be charged with conducting investigations of use of force incidents.  These use of force investigators shall receive at the outset of their assignment, specialized training in investigating use of force incidents and allegations.***

## OVERALL COMPLIANCE RATING:  NON-COMPLIANCE

## ASSESSMENT:

These provisions of this paragraph of the SA are addressed in the draft Use of Force Policies and Procedures.  However, the draft Use of Force Policies and Procedures have not been approved, signed or implemented.  A use of force investigative team has not developed, assigned or trained as required by these provisions of this paragraph of the SA.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1.   The draft Use of Force Policy and Procedures should be approved, signed and implemented.

2.   It is further recommended that LCJ officials develop, assign, and train a team of specialized use of force investigators as required by these provisions of this paragraph of the SA.

**s.   *LCJ shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation.***

## OVERALL COMPLIANCE RATING:  PARTIAL COMPLIANCE

## ASSESSMENT:

The draft Use of Force Policies and Procedures address the provisions of this paragraph of the SA.  However, the draft use of Force Policies and Procedures have not been approved, signed or implemented.

## RECOMMENDATIONS FOR THE NEXT 6 MONTHS:

1.   The draft Use of Force Policies and Procedures should be approved, signed and implemented.